Larry CASTELLI, d/b/a Castelli Designs, Plaintiff/Appellant,

v.

Lynn LIEN and George Lien, Defendants/Appellees.

Court of Appeals of Tennessee, Middle Section.

May 19, 1995.

Permission to Appeal Denied by Supreme Court Nov. 6, 1995.

Dicken E. Kidwell, Murfreesboro, for appellant.

George E. Copple, Jr., Nashville, for appellees.

## OPINION

KOCH, Judge.

This appeal involves a dispute concerning interior design services rendered in connection with the redecoration of an older home in Murfreesboro. The designer filed suit against the homeowners in the Circuit Court for Rutherford County after they refused to pay the balance of his bill. The homeowners counterclaimed for additional decorating expenses incurred after terminating the designer. The trial court heard the proof without a jury and dismissed both the designer's claim and the homeowners' counterclaim. We have determined that the designer is entitled to recover the reasonable value of his services

and, therefore, remand the case for further proceedings consistent with this opinion.

## I.

George Lien and Lynn Lien were married in June 1991 after Mr. Lien completed his residency in neurosurgery. In the summer of 1991, they moved to Murfreesboro where Dr. Lien intended to establish his practice. They rented a temporary residence for one year and began looking for a suitable house to purchase. In November 1991 they became interested in purchasing a large old house known as the Bellwood Mansion after friends told them it was on the market.

The Liens decided to seek advice concerning the Bellwood Mansion's condition. At her realtor's suggestion, Ms. Lien asked Larry Castelli, an interior designer in Murfreesboro, to assist them in determining whether they should purchase the house. Mr. Castelli agreed to work with the Liens and to charge them an hourly fee to consult with them about buying the house. Mr. Castelli and the Liens walked through the house on November 18, 1991, and Mr. Castelli told the Liens that the house would be a good buy. He also discussed in general terms how the house could be redecorated to suit the Liens' tastes.

The Liens contracted to purchase the house for $232,000 after their conversation with Mr. Castelli. Dr. Lien then began looking for financing for the house and for their planned renovations and redecorating. The Liens had difficulty obtaining financing for the renovations because the bank that loaned them the money to purchase the house would not agree to a second mortgage for the redecorating. At the Liens' request, Mr. Castelli prepared a proposed $81,500 renovation budget that included $30,000 for wallcoverings and $20,000 for draperies. Dr. Lien eventually found another bank that agreed to give them an $80,000 second mortgage for redecorating.

The Liens decided to retain Mr. Castelli to assist them with redecorating the house. Dr. Lien left most of the details of the project to Ms. Lien and Mr. Castelli. Mr. Castelli agreed to work with the Liens, but he and Ms. Lien never signed a written contract defining the scope of the work or the manner in which Mr. Castelli would be compensated for his services. While the evidence is not entirely consistent, Mr. Castelli apparently told Ms. Lien that he would earn his fee by charging them the "retail price" for the furniture, fabrics, wallcoverings, and other items he purchased for them. He did not, however, tell Ms. Lien, and she did not ask, how he would compute the "retail price" of the items used in the house.

The scope of the project changed substantially between the time the Liens contracted to purchase the house and the time the work was completed. The Liens initially planned to spend between $120,000 and $150,000 on renovations and decorations. They discussed expanding the master bedroom and bathroom, reroofing the house, reworking the driveway, turning the carriage house into a pool house, and other improvements. However, they were forced to scale back their plans when they could not obtain all the financing they sought and when they began to receive estimates for all the work they wanted to do. Ms. Lien and Mr. Castelli eventually agreed that the project would include the rooms on the first floor, the second floor hall and sitting room, and some minor work in the second floor bedrooms.

Mr. Castelli and Ms. Lien began to meet frequently in December 1991 to develop a room-by-room plan for the house. Ms. Lien had definite ideas how she wanted the house to look and gave every impression that she was familiar with fine home decorations. Most of the work Mr. Castelli and Ms. Lien discussed involved painting, wallcoverings, floor coverings, and draperies. They also discussed the placement of the Liens' furniture and the purchase of additional furniture. Mr. Castelli understood that he would be responsible for obtaining the furniture and materials and for supervising the renovation work at the house. Ms. Lien understood that Mr. Castelli was responsible for the "painting, wallpapering, and decorating services."

On December 23, 1991, Ms. Lien paid Mr. Castelli $8,000 to enable him to order part of the wallcoverings before expected price in-

creases. The Liens' first mortgage closed on March 13, 1992, and their second mortgage closed six days later. On the afternoon that the second mortgage closed, Ms. Lien delivered a $52,000 check to Mr. Castelli at his home. She asked him if the house could be decorated "like we have been talking about" for $60,000. Mr. Castelli responded, "Yes, very likely." Based on this conversation, Ms. Lien assumed that Mr. Castelli understood that their decorating budget could not exceed $60,000.

Work on the Liens' house began after the closing in mid-March 1992. The project soon encountered problems common to renovations of old homes. Rotten flooring on the first floor and wiring problems on the second floor together with extra work requested by the Liens caused the construction portion of the budget to increase from $5,000 to over $17,000. The painting budget also increased from $11–12,000 to over $17,000 because Ms. Lien expanded the scope of the work.

In addition to the changes in the scope of the work, the project was complicated by the Liens' desire to complete the project in approximately two months. Dr. Lien pushed to complete the work by Memorial Day to enable them to move into the house before the lease on their temporary home expired. Because of the short timetable, Ms. Lien refused to purchase any wallcovering or fabric that could not be delivered immediately. Accordingly, she changed her selections whenever Mr. Castelli informed her that a manufacturer could not deliver her choice immediately.

Even though she was aware of increasing construction expenses, Ms. Lien continued to select the most expensive wallcoverings and fabrics and to insist on acquiring additional furnishings for the house. Mr. Castelli, who was not accustomed to telling a client how much they could spend, did not keep Ms. Lien informed about the amount of her expenditures or of the balance remaining on her $60,000 budget. Except for one instance when he told Ms. Lien that she could not afford a $13,500 area rug, Mr. Castelli simply continued to remind Ms. Lien that she was selecting very costly materials. Mr. Castelli did not suggest, nor did Ms. Lien request,

less expensive materials. Her grandmother had used only the finest materials in her house, and Ms. Lien did not want her husband's "neurosurgeon friends from Nashville [to] come and see us live in a shack."

Ms. Lien and Mr. Castelli went on an antique buying trip to Columbia, Tennessee in April 1992. At a birthday party for some of her acquaintances later the same month, Ms. Lien confided to an acquaintance that her "wallpaper cost more than some people make in one year" and that her husband "was going to kill her because she was over budget." Despite this state of affairs, Dr. and Ms. Lien joined Mr. Castelli at the Atlanta Design Arts Center on May 5, 1992 to purchase additional items. Dr. Lien requested an itemization of all their purchases after Mr. Castelli confided to him that he was unable to control Ms. Lien's spending. In another conversation, Ms. Lien told Mr. Castelli that her husband was planning to pay him a bonus.

The expenditures became more of an issue in late May 1992 after the Liens did not receive an itemized list of expenditures from Mr. Castelli. When Ms. Lien asked whether their purchases were within the budget, Mr. Castelli told her that "I think we're okay" and suggested that she and Dr. Lien set up an appointment at his office to go over the bills. The next day, Mr. Castelli informed Ms. Lien that "we might have a little problem with the design fee."

The Liens met with Mr. Castelli at his office on the afternoon of June 24, 1992 to go over the bills for the project. Even though all the bills had not yet been assembled, Mr. Castelli presented the Liens with four invoices totaling $64,707.97. This amount included the wallcoverings, upholstery fabric, window treatments, furniture, and floor coverings. It also included a $2,500 design fee. The Liens expressed anger and surprise at the amount of the bills. Mr. Castelli suggested another meeting one week later to give him a chance to examine and to recalculate the bills.

Mr. Castelli and the Liens met again on July 2, 1992. During this meeting, Mr. Castelli presented the Liens with revised figures

showing the cost of the entire project to be $103,503.45. In addition to the items included in the earlier statements, the revised figures included the ceiling medallions and the construction and painting costs. Mr. Castelli also informed the Liens that he could reduce their bill by reducing the price of the furnishings and materials and by charging a corresponding design fee. Reducing the price of the furnishings and materials would reduce the amount of sales tax the Liens would be required to pay.

The Liens had already paid Mr. Castelli $68,885. Mr. Castelli's statement based on the retail price of the furnishings and materials showed that the Liens still owed him $34,618.45; the statement that included a $47,807.60 design fee showed a balance due of $30,674.33. The Liens refused to accept either statement and discharged Mr. Castelli because the project had exceeded their budget.

In addition to the funds they had paid to Mr. Castelli, the Liens also paid the contractor $4,021 and the painter $3,705. Even though they had already exceeded their budget by at least $16,000, Ms. Lien insisted that the project was not finished because the house was not "accessorized." Within weeks after discharging Mr. Castelli, Ms. Lien hired another interior designer from Nashville to help her rearrange her furniture and to buy additional items for the house. Ms. Lien quickly purchased $16,847 worth of additional items from her new designer, including a leopard area rug for the living room, chair and lamp tassels, two gazelles, and a runner for the dining room table.

Mr. Castelli filed suit against the Liens in August 1992 seeking $35,000. The Liens counterclaimed for $15,900 for the accessories they purchased after firing Mr. Castelli. Following a two-day nonjury trial, the trial court dismissed both parties' contract claims because they had failed to prove the existence of an enforceable oral contract. The trial court also dismissed Mr. Castelli's quantum meruit claim because it found that his use of "retail pricing" without a written explanation was a deceptive trade practice.

## II.

Mr. Castelli takes issue with the admissibility of portions of the testimony of two witnesses. First, he asserts that the trial court should not have permitted Aaron Cannon to testify concerning proper designer-client relations and the reasonable value of Mr. Castelli's work at the Liens' home. Second, he asserts that the trial court should not have permitted William Hunter to testify concerning his business practices as a general contractor. We have determined that the trial court did not commit reversible error by admitting and considering the testimony of these witnesses.

## A.

Relevant evidence is generally admissible unless the state or federal constitutions, applicable procedural rules, or other laws require its exclusion. Tenn.R.Evid. 402; *Phillips v. F.W. Woolworth Co.,* 867 S.W.2d 316, 318 (Tenn.Ct.App.1992). In order to be relevant, evidence must tend to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Tenn.R.Evid. 401; *State v. Banks,* 564 S.W.2d 947, 949 (Tenn.1978); *Given v. Low,* 661 S.W.2d 687, 689 (Tenn.Ct.App. 1983).

One of the most important functions of a trial judge is to control the admission of the evidence. Trial judges have broad discretion over the admissibility of evidence, *Otis v. Cambridge Mut. Fire Ins. Co.,* 850 S.W.2d 439, 442 (Tenn.1992); *Witter v. Nesbit,* 878 S.W.2d 116, 122 (Tenn.Ct.App. 1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 199, 130 L.Ed.2d 130 (1994), the order of the proof, *Morris v. Swaney,* 54 Tenn. (7 Heisk.) 591, 595 (1872); *Long v. Tomlin,* 22 Tenn. App. 607, 623, 125 S.W.2d 171, 181 (1938), the scope and extent of examination, *Coffee v. State,* 188 Tenn. 1, 4, 216 S.W.2d 702, 703 (1948), and the qualification of expert witnesses. *Lazy Seven Coal Sales, Inc. v. Stone & Hinds, P.C.,* 813 S.W.2d 400, 406–07 (Tenn.1991); *Kirksey v. Overton Pub, Inc.,* 804 S.W.2d 68, 74 (Tenn.Ct.App.1990). Accordingly, appellate courts will reverse a trial judge's decision on one of these matters only

when the trial judge has abused his or her discretion and when the error has affected substantial rights of one or both of the parties. *See* Tenn.R.Evid. 103(a).

**B.**

■ The communications between Mr. Castelli and the Liens concerning their expenditures in relation to their budget became an issue at trial. Mr. Castelli testified, in effect, that he responded to the Liens' pricing questions when he was asked but that he was not asked about the cumulative amount of expenditures until relatively late in the project. For their part, the Liens testified that Mr. Castelli generally did not provide them with specific answers to their questions about prices and did not warn them when their expenditures began to approach $60,-000.

To buttress their respective cases, both sides presented testimony concerning how to contract for home decoration or remodeling services. The proof focused on the advisability of promoting mutual understanding concerning (1) the scope of the work, (2) the budget, (3) the procedure for making changes in the work, and (4) the billing procedure. Not surprisingly, most of the witnesses stressed the importance of clear understanding between the owner and the artisans concerning these matters as the job progressed. Aaron Cannon, another interior designer from Murfreesboro, explained how using a written contract with his clients minimized the possibility of disputes as the job progressed. Likewise, William Hunter, the contractor who performed the work on the Liens' house, testified about his practice of obtaining the owner's approval when a change in the scope of the work caused an increase in the cost of the project.

This testimony has only marginal relevance to the contractual and quasi-contractual issues involved in this case. The Liens and Mr. Castelli did not have a written contract, but having a written contract, although advisable, is not legally necessary. Whether the contract is written or not, parties working on projects such as this one should communicate with each other concerning cost and budget issues. Communication is, however, a shared responsibility. Thus, Mr. Hunter's and Mr. Cannon's testimony concerning their relationships with their customers stated the obvious and added little to the fact-gathering process.

The trial court could very well have excluded the testimony concerning contracting practices for home decorating or renovation projects, but it did not. We decline to second-guess this decision. Allowing Mr. Cannon and Mr. Hunter to testify concerning their experience and business practices did not affect any of Mr. Castelli's substantive rights. This case was not tried to a jury, and the trial court was well qualified to decide what weight, if any, this testimony should have been given.

**III.**

■ Mr. Castelli also takes issue with the trial court's denial of his contract claim. His arguments concerning this issue have been combined with those involving two other issues. We have chosen to address these questions even though the content of Mr. Castelli's brief does not meet the requirements of Tenn.R.App.P. 27 or Tenn.Ct. App.R. 6.[1] We find that the trial court correctly determined that Mr. Castelli had not shouldered his burden of proving the existence of a binding oral contract with regard to the renovation and redecoration of the Liens' house.

■ Unless required by law, contracts need not be in writing in order to be enforceable. *Bill Walker & Assocs., Inc. v. Parrish,* 770 S.W.2d 764, 771 (Tenn.Ct.App.1989). Oral contracts are enforceable, but persons seeking to enforce them must prove mutual assent to the terms of the agreement, *American Lead Pencil Co. v. Nashville, C. & St. L. Ry.,* 124 Tenn. 57, 63–64, 134 S.W. 613, 615 (1910); *Price v. Mercury Supply Co.,* 682 S.W.2d 924, 933 (Tenn.Ct.App.1984), and must also demonstrate that the terms of the

---

1. Among other shortcomings, Mr. Castelli's brief does not include an argument on the contract issue and lacks proper citations to the record.

contract are sufficiently definite to be enforceable. *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n,* 807 S.W.2d 559, 564 (Tenn.Ct.App.1990); *Oak Ridge Precision Indus., Inc. v. First Tenn. Bank Nat'l Ass'n,* 835 S.W.2d 25, 28 (Tenn.Ct.App.1992). Mr. Castelli's proof fails on both counts.

The parties' differing versions of their contract demonstrate that they did not have a meeting of the minds concerning the essential terms of their agreement. Mr. Castelli stated that the Liens agreed to pay the construction and painting bills and to pay his "retail price" for all the fabrics, furnishings, and wallcoverings used in the house. The Liens testified that Mr. Castelli agreed to decorate their house for $60,000 and that his decorating services included the contracting, the painting and wallcoverings, the draperies, and the accessorizing that would give the house the "overall image" they were seeking.

█ While we are reluctant to undermine a contract for uncertainty when one of the parties has performed, *Minor v. Minor,* 863 S.W.2d 51, 54 (Tenn.Ct.App.1993), we agree with the trial court that the evidence does not establish a contract whose terms are sufficiently definite to be enforced. We are unable to discern any clearly defined, mutually agreed upon terms relating to the scope of the work, the cost, and the time for performance. All that remains without these terms is an agreement to pay whatever the designer charged and that sort of agreement is simply too general to be enforced.

### IV.

We now turn to Mr. Castelli's quantum meruit claim. The trial court declined to award Mr. Castelli the reasonable value of his services because he did not use a written contract that explained his markup on furnishings and decorations. We do not find Mr. Castelli's conduct to be fraudulent or deceptive, and accordingly, we find that he is entitled to recover the reasonable value of his services on this project.

### A.

█ Quantum meruit actions are equitable substitutes for contract claims. They enable parties who have provided goods and services to another to recover the reasonable value of these goods and services when the following five circumstances exist:

(1) there must be no existing, enforceable contract between the parties covering the same subject matter, *Robinson v. Durabilt Mfg. Co.,* 195 Tenn. 452, 454–55, 260 S.W.2d 174, 175 (1953);

(2) the party seeking recovery must prove that it provided valuable goods and services, *Moyers v. Graham,* 83 Tenn. 57, 62 (1885); *Wrinkle v. J.F. Larue & Son,* 9 Tenn.App. 161, 165–66 (1927);

(3) the party to be charged must have received the goods and services, *Paschall's, Inc. v. Dozier,* 219 Tenn. 45, 54, 407 S.W.2d 150, 154 (1966); *Jaffe v. Bolton,* 817 S.W.2d 19, 26 (Tenn.Ct.App.1991);

(4) the circumstances must indicate that the parties involved in the transaction should have reasonably understood that the person providing the goods or services expected to be compensated, *V.L. Nicholson Co. v. Transcon Inv. & Fin. Ltd.,* 595 S.W.2d 474, 482 (Tenn. 1980); and

(5) the circumstances must also demonstrate that it would be unjust for the party benefitting from the goods or services to retain them without paying for them. *Pascall's, Inc. v. Dozier,* 219 Tenn. at 54, 407 S.W.2d at 154; *Reprise Capital Corp. v. Rogers Group, Inc.,* 802 S.W.2d 608, 610 (Tenn.Ct. App.1990).

█ Liability under quantum meruit is based on a legally implied promise to pay a reasonable amount for goods or services received. *John J. Heirigs Constr. Co. v. Exide,* 709 S.W.2d 604, 607 (Tenn.Ct.App.1986); *Tennessee Farmers Mut. Ins. Co. v. Pritchett,* 54 Tenn.App. 410, 417, 391 S.W.2d 671, 675 (1964). Thus, quantum meruit recoveries are limited to the actual value of the goods or services, *Lawler v. Zapletal,* 679 S.W.2d 950, 955 (Tenn.Ct.App.1984), not their contract price. *Warren Bros. Co. v. Metropolitan Gov't,* 540 S.W.2d 243, 247 (Tenn.Ct.App.1976); *Cooksey v. Shanks,* 23 Tenn.App. 595, 598, 136 S.W.2d 57, 58–59

(1939). Courts will not award quantum meruit recoveries without some proof of the reasonable value of the goods or services, *Bokor v. Holder*, 722 S.W.2d 676, 680–81 (Tenn.Ct.App.1986); *Sadler v. Middle Tenn. Elec. Membership Corp.*, 36 Tenn.App. 495, 500, 259 S.W.2d 544, 547 (1952), but the required proof may be an estimation of the value of the goods and services. *Adams v. Underwood*, 225 Tenn. 428, 438, 470 S.W.2d 180, 184 (1971).

A party who had a contract at one time may pursue a quantum meruit recovery if the contract is no longer enforceable. *Paschall's, Inc. v. Dozier*, 219 Tenn. at 55, 407 S.W.2d at 154–55; *Cooper & Keys v. Bell*, 127 Tenn. 142, 150–51, 153 S.W. 844, 846 (1913); *Cooksey v. Shanks*, 23 Tenn.App. at 598, 136 S.W.2d at 59. However, since quantum meruit is an equitable remedy, *Zirkle v. City of Kingston*, 217 Tenn. 210, 224, 396 S.W.2d 356, 363 (1965); *John J. Heirigs Constr. Co. v. Exide*, 709 S.W.2d at 607, a party seeking relief must be able to overcome the equitable "lack of clean hands" defense. *SKS Communications, Inc. v. Globe Communications, Inc.*, App. No. 03–A–01–9405–CH–00176, slip op. at 13, 19 T.A.M. 47–23, 1994 WL 589576 (Tenn.Ct. App. Oct. 21, 1994) (No Tenn.R.App.P. 11 application filed).

**B.**

Mr. Castelli and the Liens never had detailed discussions concerning his fee. In November 1991, Mr. Castelli informed Ms. Lien that he would charge her the "retail price" of the furnishings, fabrics, and wallcoverings used in her house and that he would also charge her for his design time. He did not explain, and Ms. Lien did not ask, about the hourly rate for his design time or the way he calculated the retail price of the items used for the project. Ms. Lien assumed that Mr. Castelli would mark up the price of the furnishings, fabrics, and wallcoverings 30 to 40% over his cost.

Mr. Castelli testified at trial that interior designers could compute their fees using two different methods. The first method was to charge his clients the retail price of the items used in the project and a design fee. The second method was to use a smaller markup on the items used in the project and then to charge a larger design fee. Mr. Castelli stated that he worked strictly on a "retail" basis and that he informed all his customers of this when they first consulted him.

Mr. Castelli explained at trial that his standard retail price for items ordered for a specific job was based on a one hundred percent mark up over the item's cost and applicable shipping charges. For items he kept in stock, he explained that he used the manufacturer's suggested retail price. In addition, Mr. Castelli added ten percent to the labor charges for the upholstery and wallcoverings but did not add ten percent to the construction or painting costs. He also explained that he added an additional ten percent to the cost of the items he purchased specifically for the Liens because of the time he spent on their project beyond what he would have normally spent and that he computed the sales tax based on the retail price of the materials used in the project.

The other interior designers who testified at trial agreed that charging the "retail price" for furnishings and other items was an acceptable industry practice. They also testified, however, that there was no standard method for determining the "retail price" and that different interior designers computed the "retail price" in different ways. Some of the designers stated that Mr. Castelli's charges were consistent with their practices, while others stated that they charged less.

The trial court decided that the practice of charging a design fee and then requiring a customer to pay the "retail price" for the items used in a project was "deceptive and capable of being used to gouge and/or defraud the general consuming public using interior design services." The trial court also concluded that calculating charges on this basis without providing the client with a written agreement "that incorporates in clear unmistakable language the elements and amounts that make up retail pricing" was an unfair and deceptive practice under the Ten-

nessee Consumer Protection Act of 1977.[2] Accordingly, the trial court determined that Mr. Castelli should not be rewarded for engaging in an unfair trade practice and declined to grant him quantum meruit relief.

### C.

■ Neither party raised the issue of the Tennessee Consumer Protection Act of 1977 in their pleadings. Mr. Castelli's complaint asserted alternative causes of action for breach of contract and quantum meruit. The Liens' answer joined issue on these theories, and their counterclaim contained an allegation of breach of contract on Mr. Castelli's part. The trial court injected the Tennessee Consumer Protection Act of 1977 into the proceedings after the trial was well under way.

■ Pleadings give notice to the parties and the trial court of the issues to be tried. *Poster v. Andrews,* 182 Tenn. 671, 677, 189 S.W.2d 580, 582 (1943); *Hammett v. Vogue, Inc.,* 179 Tenn. 284, 290, 165 S.W.2d 577, 579 (1942). Providing this notice assists the parties in preparing for trial and also assists the trial court in focusing on the matters that are at issue. The failure to assert a claim or defense in a timely manner is generally deemed to amount to a waiver of the right to rely on the claim or defense at trial. *See Steed Realty v. Oveisi,* 823 S.W.2d 195, 197 (Tenn.Ct.App.1991) (statute of limitations defense deemed waived when not timely asserted in the proper manner); *Thompson, Breeding, Dunn, Creswell & Sparks v. Bowlin,* 765 S.W.2d 743, 744 (Tenn. Ct.App.1987) (affirmative defenses deemed waived because they were not asserted in the answer); Tenn.R.Civ.P. 12.08.

The Liens did not rely on the Tennessee Consumer Protection Act of 1977 as a defense to Mr. Castelli's contract and quantum meruit claims and did not rely on the Act in their counterclaim. Accordingly, Mr. Castelli was not put on notice that he would be required to demonstrate that his dealings with the Liens were not unfair or deceptive acts or practices under the Act. With the proceedings in this posture, the trial court should not have injected the Act into the proceedings after the trial had started and should not have relied on the Act to determine that Mr. Castelli was not entitled to quantum meruit relief.

■ Had the Liens advanced either a claim or a defense based on the Tennessee Consumer Protection Act of 1977, we would still find that Mr. Castelli's conduct did not amount to an unfair or deceptive act or practice. Retail merchants are entitled to make a profit and, except for the most extreme circumstances, are not required to divulge to their customers their profit margin, overhead, operating costs, or other similar information.[3] The Liens did not allege or attempt to prove that Mr. Castelli made any misrepresentations concerning the price, characteristics, or quality of the goods he sold them. In the absence of proof of misrepresentations or of some unethical, unscrupulous, or oppressive conduct, Mr. Castelli's failure to disclose his cost or his markup was not a violation of the Tennessee Consumer Protection Act of 1977.

### D.

■ Our conclusion that the trial court should not have based its decision on the Tennessee Consumer Protection Act of 1977 does not necessarily mean that Mr. Castelli is entitled to recover in quantum meruit. Since quantum meruit is an equitable remedy, Mr. Castelli could still be denied recovery if he acted unethically, improperly, or in bad faith with regard to the transaction at issue. We do not find that Mr. Castelli's conduct was so improper that he should be prevented from recovering the reasonable value of his services.

---

**2.** See Tenn.Code Ann. §§ 47–18–104(a), –104(b)(27) (Supp.1994).

**3.** A retailer may be required to disclose pricing information under certain circumstances. One trial court has held that selling goods for two to three times more than the manufacturer's suggested retail price without disclosing the manufacturer's suggested retail price to the consumer is an unfair or deceptive practice. *City of New York v. Toby's Elecs., Inc.,* 110 Misc.2d 848, 443 N.Y.S.2d 561, 565 (Civ.Ct.1981).

Persons who sell goods and services to the general public are not, as a general matter, required to enter into written contracts with their customers. They are likewise not required to disclose their markup or profit margin. We perceive of no reason why interior designers should be treated differently from jewelers, florists, antique dealers, attorneys, or any other retail provider of goods and services. While using a written contract might deter disputes such as the one involved in this case, we decline to hold that Mr. Castelli's practice of not entering into written contracts with his customers was improper.

Mr. Castelli was required to respond completely and accurately to his customer's inquiries concerning how much he intended to charge them for the furnishings, fabrics, and other materials he purchased on their behalf. He was, however, not required to volunteer this information until he submitted his bill, and he was not required to disclose his markup or profit to his customers. Buyers in the marketplace make their decisions based on their perception of the value or utility of the product to them, not on their assumptions concerning the seller's profits. Information concerning a seller's overhead and profit is simply not the sort of information that the law requires retailers to disclose.

We concur with the trial court's observation that the debacle facing Mr. Castelli and the Liens in June 1992 was of their own making. They relied on their own uncommunicated assumptions and intentions rather than on clear and mutual understandings. On one hand, the Liens envisioned that their house would be fully decorated from top to bottom, down to the tassels on the dining room chairs, for $60,000. On the other hand, Mr. Castelli assumed that the Liens understood that the project was going to exceed $60,000 when they increased the scope of the work and when Ms. Lien, knowing of the increased construction and painting costs, continued to insist on selecting the most expensive furnishings and fabrics that were immediately available.

Mr. Castelli warned Ms. Lien repeatedly that she was making very expensive selections but did not keep a running account of the expenditures for her. At the same time, Ms. Lien did not request an accounting of the expenditures until late in the project and did not appear to be ready to use less expensive materials in her home. While Mr. Castelli's dealings with the Liens should not be a model for other interior designers to follow, we do not find that his conduct was so oppressive or overreaching that he should be prevented from recovering the reasonable value of his services.

### E.

No precise formula exists for determining the reasonable value of Mr. Castelli's services. The Liens would have been required to pay for design services in some amount even if they had not hired Mr. Castelli since they were not going to redecorate their home without the assistance of an interior designer. Thus, the value of Mr. Castelli's services falls somewhere between his actual material and labor costs and the amount of his bill.

Not surprisingly, Mr. Castelli asserts that he charged the Liens the reasonable value of his services and that the Liens owe him $27,610. The record, however, also contains the testimony of two other interior designers concerning the reasonable value of his services. An interior designer testifying for Mr. Castelli stated that Mr. Castelli was entitled to at least $25,000 more than this actual material and labor costs less the payments he had already received. Another interior designer testifying for the Liens stated that the value of Mr. Castelli's work was between $71,600 and $72,700.

Mr. Castelli's labor costs were approximately $32,265,[4] and his cost for the furnishings and materials used on the project was approximately $27,395.[5] Thus, Mr. Castelli expended a total of $59,660 on the Liens'

---

4. This amount does not include the additional labor costs paid by the Liens.

5. This amount does not include the Liens' own expenditures for furnishings, materials, and ac-cessories. It also does not include the sales tax that Mr. Castelli would have been required to collect from the Liens for these materials.

house. He received $68,885 from the Liens; therefore, the Liens' payments to Mr. Castelli exceed his actual costs by $9,225. Since a portion of these funds would have been allocated to the sales tax on the materials used on the project,[6] the Liens have already paid Mr. Castelli approximately $5,000 to $7,000 more than his actual expenditures on their behalf.

The range of values for Mr. Castelli's services established by the two other interior designers who testified at trial was between $71,600 and $84,660. Deducting from these amounts the payments the Liens have already made, Mr. Castelli would be entitled to recover between $2,715 and $15,775. We have determined that Mr. Castelli is not entitled to recover $15,775. In light of the proof concerning several bookkeeping errors, the uncertainty concerning the cost of some of the in-stock materials used on the project, the uncertainty concerning the amount of the sales tax, and Mr. Castelli's inability to provide accurate information concerning the amount of time he spent on the project, we have determined that the reasonable value of his services to the Liens was $75,048. Accordingly, Mr. Castelli is entitled to a $6,163 judgment against the Liens.

## V.

We reverse the portion of the judgment dismissing Mr. Castelli's quantum meruit claim against the Liens and remand the case to the trial court with directions to enter a judgment against the Liens awarding Mr. Castelli $6,163 and for whatever other proceedings may be required. We also tax the costs of this appeal jointly and severally to George Lien and Lynn Lien for which execution, if necessary, may issue.

TODD, P.J. (M.S.), and CANTRELL, J., concur.

---

**6.** The sales tax for the material used in the Liens' home would have been between $2,500 and $5,000 depending on the method of calculation.