# FILED

**November 30, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**
**IN THE COURT OF APPEALS OF TENNESSEE**
**AT NASHVILLE**

| | |
|---|---|
| **RICHARD L. JOHNSON and** ) | |
| **JENNIFER JOHNSON** ) | |
| ) | |
| Plaintiffs ) | Davidson Circuit No. 95C-1573 |
| ) | |
| **v.** ) | |
| ) | |
| **STONEY HUNTER, ET AL,** ) | Appeal No. M1998-00314-COA-R3-CV |
| ) | |
| Defendants. ) | |
| ) | |
| **IN THE MATTER OF DENTY** ) | |
| **CHEATHAM'S FEE** ) | |
| ) | |
| **PATRICK ARDIS,** ) | |
| ) | |
| **Appellant,** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| **DENTY CHEATHAM,** ) | |
| ) | |
| **Appellee.** ) | |

APPEAL FROM THE DAVIDSON COUNTY CIRCUIT COURT
AT NASHVILLE, TENNESSEE

THE HONORABLE THOMAS W. BROTHERS, JUDGE

For the Appellant:                    For the Appellee:

Glenn G. Reid, Jr.                    David B. Lyons
Memphis, Tennessee                    Nashville, Tennessee

Robert J. Walker
Nashville, Tennessee


**REVERSED AND REMANDED**


HOLLY KIRBY LILLARD, J.


CONCURS:

W. FRANK CRAWFORD, P.J., W.S.

DAVID R. FARMER, J.

**OPINION**

This appeal is a dispute between two attorneys over attorney's fees incurred in a contingency fee personal injury and product liability lawsuit. The plaintiff attorney associated the defendant attorney for the product liability aspect of the lawsuit. The plaintiff attorney withdrew before the conclusion of the case and sought half of the attorney's fees. Finding that the attorneys had entered into a joint venture, the trial court awarded the plaintiff attorney one-third of the contingency fee. The defendant attorney appeals. We find that the law of joint venture is inapplicable because the contract between the attorneys is unenforceable for lack of agreement on an essential term, and reverse and remand for an award of attorney's fees based on the theory of *quantum meruit*.

In September 1994, Richard Johnson was severely injured in an automobile accident. The driver of the other car, Stoney Hunter, was driving a Camaro with a T-top roof at the time of the accident. In the accident, one of the T-tops dislodged, traveled through the open window of Johnson's truck, and pierced the left side of his skull.

Richard Johnson's wife, Jennifer Johnson, worked as a bookkeeper for the Nashville law firm of Cheatham and Palermo. The Johnsons asked one of the partners in the firm, plaintiff attorney Denty Cheatham ("Cheatham") to represent Richard Johnson ("Johnson"). Cheatham filed suit against Stoney Hunter ("Hunter"). In the course of discovery, Cheatham investigated the policy limits of Hunter's

insurance carrier. Cheatham found that the policy had a liability limit of only $50,000. Consequently, Cheatham filed a product liability action against General Motors, the maker of Hunter's Camaro; Libbey Owen's Ford, the manufacturer of the T-top glass panels; and Pittsburgh Plate Glass Industries, the manufacturer of the rear window glass. Cheatham had had limited previous experience with product liability cases, so he contacted defendant attorney Patrick M. Ardis ("Ardis") of the Wolff Ardis law firm in Memphis. Ardis' law firm specialized in automobile glass cases.

Ardis and Cheatham agreed to associate under a contingency fee contract. The Johnsons agreed to this arrangement. The contract among the Johnsons, Cheatham, and Ardis provided that the attorneys would receive a 33⅓ % contingency fee if the case were settled before trial, and a 35% contingency fee if the case went to trial. The division of fees between the two attorneys was left as "a matter to be agreed between WOLFF ARDIS and CHEATHAM & PALERMO." Ardis testified that he and Cheatham agreed on a 50/50/50 split: each party would do 50% of the work, they would split the expenses 50%, and split the fee 50%. Cheatham denied any agreement to pay 50% of the expenses, and testified that the parties agreed only to a 50/50 split: the parties would split the work 50% and split the fees 50%. Ardis and Cheatham agreed that Cheatham would handle the medical and damages aspects of the case and ready the case for trial, and Ardis would handle the product liability aspect of the case.

Relations between the attorneys began to disintegrate in early 1997. On February 7, 1997 Ardis wrote Cheatham a letter asking Cheatham to pay one-half of the outstanding expenses. On April 1, 1997, Ardis sent Cheatham another letter requesting that Cheatham pay one-half of the expenses, which by this time totaled approximately $100,000. A third letter dated July 7, 1997 requested more money for expenses from Cheatham. Cheatham responded by letter on July 10, 1997. In this letter, Cheatham denied agreeing to share the expenses incurred by Ardis' firm. He explained that in the twenty-four year history of his law firm, the firm had never advanced expenses more than $10,000 in any one case. Cheatham indicated his belief that the Johnsons would contribute $45,000 toward expenses from the settlement with Hunter's insurance company. Cheatham also felt that the Johnsons

would pay some additional expenses as they arose because Richard Johnson was still receiving a salary despite his disability. In the letter, Cheatham also explained that when he associated the law firm of Wolff Ardis, a law firm that specialized in glass litigation, he believed that much of their previous work would be relevant to the case:

I thought there would be some carry-over from the other cases, and "the wheel" would not need to be completely reinvented. Also, I thought that I was associating with a firm that was used to dealing with the large advances of expenses which might be necessary in a product liability case. I think I made it clear that our firm was not accustomed to dealing with such situations. I thought your firm was in a position to advance all or most of these expenses . . . . I also thought that you would do a lot of this work "in house," and this expense would not need to be reimbursed until the conclusion of the lawsuit. I do not recall ever having a discussion with you, until recent months, about any of the expenses your firm expected to incur during the course of this litigation, in terms of amount, or any discussion about our firm advancing a portion of that expense.

Cheatham also complained that "the large volume" of paperwork and bills Ardis sent were "complex and confusing." Cheatham questioned some of the expenses, asserting that some charges benefitted more than one of Ardis' automobile glass cases, and thus should not have been billed entirely to the Johnsons. Cheatham wrote that, unlike the Wolff Ardis firm, his firm did not charge clients for

overhead items such as phone calls, faxes, and copies in a contingency fee case, and that it was therefore not equitable for him to have to reimburse Ardis for such overhead expenses.

Several other letters were exchanged between Ardis and Cheatham with increasing hostility. Cheatham eventually agreed to accept less than 50% of the fee since he was not willing to advance expenses. However, he viewed Ardis' offer of 7 ½% as an insult. Cheatham complained that Ardis' position on the fees "creates the appearance that as this case approaches a conclusion which may result in a big settlement or judgment, you want to bite the hand that fed you, by squeezing out the lawyer who associated you in the case, in order to reap more than 90 percent of the fees." Ardis responded that Cheatham's request for 50% of the fee without advancing 50% of the expenses or doing 50% of the work was "unethical" and proposed a meeting with a member of the Board of Professional Responsibility. (August 26, 1997 fax)

Ultimately, Cheatham concluded that the fee dispute had escalated to a point at which it was not in the client's best interests for him to remain in the case. On September 26, 1997, Cheatham filed a motion with the trial court to which Johnson's lawsuit was assigned, asking for permission to withdraw and for a lien to be placed on the cause of action to protect his fee. The Johnsons agreed to Cheatham's withdrawal. On January 9, 1998, the trial court entered an order permitting Cheatham to withdraw from the case. The trial court also approved a lien for attorney's fees and reserved the issue of the division of fees to be resolved at the conclusion of the case.

After Cheatham withdrew, Ardis associated Robert Walker with the Nashville law firm Bass, Berry & Sims, for 7 ½% of the contingency fee collected by Ardis. Under the agreement between Bass, Berry & Sims and the Ardis firm, Bass, Berry & Sims was not expected to advance expenses. Bass, Berry & Sims spent approximately 850 hours on the case.

Ardis eventually obtained a settlement on behalf of Richard Johnson totaling $4,332,500. The expenses involved in the case totaled over $800,000. Cheatham sought attorney's fees from the settlement. A hearing was held on September 14 and 15, 1999, before the trial judge who handled the underlying lawsuit and who was familiar with the attorneys' contributions.

At the hearing, the parties stipulated that Cheatham enjoys a reputation for truthfulness in the Nashville legal community and a reputation as a skilled and experienced trial lawyer. Richard Johnson testified that Cheatham did a good job representing him. Rose Palermo, Cheatham's law partner and wife, testified that Cheatham worked on the case more than any other case he had handled in the twenty-six years of their joint practice.

Cheatham testified about his contributions to the case, such as: obtaining and examining accident reports and hospital records, contacting an accident reconstructionist, collecting and saving glass samples from the accident, correcting and amending the complaint, responding to requests for admissions and discovery, preparing the Johnsons for depositions, acting as sole attorney in a dozen depositions of key witnesses and emergency personnel, attending the settlement conference, obtaining and preparing documents for the mediation, attending the mediation, and investigating a prior workers' compensation claim filed by Johnson.

Cheatham was the sole attorney on the case from August 1995 to December 1995. Throughout the summer of 1997, while Cheatham was disputing the fee agreement with Ardis, Cheatham continued to be involved in the case. Cheatham denied any agreement about the division of expenses on the case. However, he acknowledged that he paid for some of the expenses, including costs for some of the depositions and medical records. He also pointed out that he had contributed half the funds needed to purchase Hunter's Camaro, while the Johnsons paid the other half. Cheatham testified that he did not keep time records for his work in the case because it was a contingency fee case, but he estimated that he spent approximately 1500 hours on it. Cheatham's secretary, Jane Wheeler, also testified that Cheatham spent a considerable amount of time on the case and that Cheatham installed a modem in order to communicate with Ardis.

At the hearing, Ardis testified that the "50/50 division of the fee was altered on day two of the agreement when the work started being done more by Wolff Ardis than Mr. Cheatham." Ardis admitted that he owned 99% of one company, Strategic Intelligence Group, which billed the Johnsons for $145,000 of expenses, and that he owned 100% of another company, Legal Vision, which billed the

Johnsons for approximately $15,000 of expenses. Ardis contended that Cheatham agreed to pay one-half of the expenses owed to third parties. In support of this assertion, Ardis offered into evidence a letter dated July 7, 1997, reflecting that the Ardis firm had deducted internal expenses from those that Cheatham owed. Ardis conceded, however, that he had no letter from Cheatham agreeing to this. Bob Walker, the attorney from Bass, Berry & Sims, testified that

> it was the tenacity and the diligence that Mr. Ardis put on General Motors, particularly in fighting their usual discovery tactics, that I felt like ultimately brought General Motors around to the settlement that was achieved. . . . . [A]nd I have never seen [a firm] in a product case or any trust case or any so called big case where I thought more intense work and quality work was done . . .

After the hearing, the trial court found that the parties had initially agreed to split the fee equally and that the agreement could be modified if the work was disproportionate, but that they never agreed on how the fee agreement would be modified. The trial court also found that there never was a written agreement to share expenses, and noted that, absent an agreement, a lawyer is not obligated to advance expenses to a client. As a result, the trial court concluded that the parties had entered into a joint venture, under which profits are presumptively split equally. However, the trial court found that special circumstances required that Cheatham be awarded less than half of the contingency fee. The trial court found that Cheatham's withdrawal before the conclusion of the case was a special circumstance. It found that his withdrawal was for good cause, noting that, had the withdrawal not been for good cause, Cheatham would be entitled to no recovery. Disciplinary Rule 2-107 of the Rules of Professional Responsibility, which requires fee sharing agreements to compensate the attorneys in proportion to their work, was found to be another special circumstance.[1] The trial court did not consider this case to be a mere fee referral, however:

> In this case we have a contingency fee where a lawyer who did work, who worked for some period of time, laid the groundwork . . . He stabilized the situation at the outset, . . . he essentially negotiated the settlement so that it held up with Mr. Hunter. And he then went about to find the best specialist in the field to help his client . . . . [T]he value conferred upon his clients by Mr. Cheatham's diligent research and efforts in finding out who was the right person is something that's hard to put a dollar figure to. There is no mathematical formula that can be applied here.
> And in addition to the hours of work that he expended representing his clients before and after

Mr. Ardis came on, he also gave his clients the benefit of wise counsel and advice.

The trial court also found that Ardis "performed significantly more work in this case than Mr. Cheatham." The trial court explained:

> I find that Mr. Cheatham is entitled to compensation in accordance to the benefits he conferred upon his clients under the guidelines of DR 2-107, and there just is no way for me to take hours and take that and add it up. That isn't a fair mixture of it. More work was done by Ardis, but valuable, significant work was done by Mr. Cheatham.

Based on all of these findings, the trial court awarded Cheatham $480,426.50 in attorney's fees, one-third of the total contingency fee. From this order, Ardis now appeals.

On appeal, Ardis argues that the trial court erred in basing its award on joint venture law rather than *quantum meruit*. Ardis contends that the trial court erred in its factual findings that Cheatham was justified in withdrawing from the case and that Cheatham expended 1500 hours on the case. Ardis asserts that the trial court erred in concluding that a lawyer is not obligated to advance expenses absent a written agreement. Finally, Ardis argues that the trial court's award was excessive, unreasonable, and inequitable.

Our review of this case is governed by Rule 13(d) of the Tennessee Rules of Appellate Procedure, which provides that review of findings of fact by the trial court shall be *de novo* upon the record of the trial court, accompanied by a presumption of correctness of the findings of fact, unless the evidence preponderates otherwise. Our review of all findings of law will be *de novo*, with no presumption of correctness. *See* Tenn. R. App. P. 13(d); ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993).

Ardis first argues that the law of joint venture does not apply under these circumstances. Ardis asserts that the presumption under joint venture law that profits are split equally is contrary to Disciplinary Rule 2-107 of Tennessee Code of Professional Responsibility, which provides that attorney's fees in Tennessee are to be allocated in proportion to the services performed. Ardis contends that there could not have been a joint venture because the parties did not share control of the case or share the risk. He argues that there was no contract between Ardis and Cheatham because they failed to agree on essential terms, namely, the division of advanced expenses and fees. Consequently, Ardis

maintains that Cheatham is limited to recovery under the theory of *quantum meruit*.

Cheatham argues for the application of joint venture law and the presumption that profits are to be split equally. He asserts that Disciplinary Rule 2-107 is not violated where both attorneys perform substantial services and that the rule does not require a pro-rata division of fees based upon hours alone. He maintains that the contract between Ardis and Cheatham is enforceable.

We first address the trial court's factual finding that the parties had an agreement which amounted to a joint venture. "A joint venture is an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit." *Fain v. O'Connell*, 909 S.W.2d 790, 793 (Tenn. 1995)(quoting *Spencer Kellog & Sons, Inc. v. Lobban*, 315 S.W.2d 514, 520 (Tenn. 1958)). For a joint venture to exist, there must be a contract of some sort between the parties regarding their intent to enter together into a business venture for profit. *See Dewberry v. Maddox*, 755 S.W.2d 50, 56 (Tenn. App. 1988)(citing *Cecil v. Hardin*, 575 S.W.2d 268, 271 (Tenn. 1978) (a joint venture requires "some manner of agreement" among parties to joint venture). Since a joint venture is defined as "an association of persons with intent, by way of contract, express or implied," *Fain*, 909 S.W.2d at 793, joint venture cannot be found to exist where the parties do not have a valid contract. *See Spencer Kellog*, 315 S.W.2d at 520.

In order for a valid and enforceable contract to be formed, there must be a meeting of the minds as to the essential terms of the contract. *See Roy McAmis Disposal Service, Inc. v. Hiwassee Sys., Inc.*, 613 S.W.2d 226, 229 (Tenn. App. 1979). Failure to agree on an essential matter can prevent the formation of a valid contract. "'[O]ne of the elements essential to the formation of a contract is a manifestation of agreement or mutual assent by the parties to its terms, and the failure of the parties to agree upon or even discuss an essential term of a contract may indicate that the mutual assent required to make or modify a contract is lacking.'" *Jamestown On Signal, Inc. v. First Federal Sav. & Loan Ass'n*, 807 S.W.2d 559, 566 (Tenn. App. 1990)(quoting *The Delcon Group, Inc., et al. v. Northern Trust Corp., et al.*, 543 N.E.2d 595, 600 (1989)).

Moreover, the parties must agree as to the essential terms with sufficient specificity that a court can determine if a breach has occurred, and how to remedy it. *Id.* at 564. "Oral contracts are

enforceable, but persons seeking to enforce them must prove mutual assent to the terms of the agreement, and must also demonstrate that the terms of the contract are sufficiently definite to be enforceable." *Castelli v. Lien*, 910 S.W.2d 420, 427 (Tenn. App. 1995). "Indefiniteness as to any essential element of an agreement may prevent the creation of an enforceable contract." *Peoples Bank of Elk Valley v. ConAgra Poultry Co.*, 832 S.W.2d 550, 553 (Tenn. App. 1991).

In *Castelli,* a husband and wife contracted with an interior designer to renovate and redecorate their newly purchased home. The designer and the wife entered into an oral agreement under which the designer would collect his fee by charging the husband and wife the "retail price" for the furnishings and materials used in their home. *Id.* at 423. The parties had no agreement, however, about how the designer would determine the amount of the "retail price." *Id.* In addition, the parties had no understanding about the total cost for the project. *Id.* at 424. The wife testified that she discussed her ideas for renovation and decoration with the designer and asked if the project could be completed for $60,000, and that the designer replied "very likely." The designer testified that there had never been any understanding that the couple's budget was limited to $60,000. He asserted that the wife changed her selection of materials during the course of the project, and that she continued to choose the most expensive materials, despite his warnings that she was selecting "very costly products." *Id.*

Before the work was completed, the husband became concerned about the cost and asked for a detailed accounting of expenses. The designer presented the couple with a statement showing the entire project's costs at $103,503.45, which included a $47,807.60 design fee. The couple became upset and fired the designer, refusing to pay him the $35,000 balance he claimed was due. The designer then sued on the contract. *Id.*

The trial court ruled that the method by which the designer calculated the retail price charged was an essential term to the contract, and because the parties had not come to any agreement about it, a valid and enforceable contract never existed. The appellate court agreed that there was never a contract "whose terms [were] sufficiently definite to be enforced", and held that the designer's remedy was limited to *quantum meruit*. *Id.* at 427.

In this case, Cheatham testified that he never agreed to pay half the expenses. He asserted that he and Ardis never even discussed the payment of expenses at the time that they entered into their agreement, and that Ardis never gave him any indication of what the expenses might total. Cheatham testified that he knew that expenses could mount up in a product liability case, and, for that reason, that it was important to have substantial potential damages to make it worthwhile to file suit. In this case, he said, it was obvious there were considerable damages, since Richard Johnson had sustained a serious brain injury. Cheatham stated that he had no way of knowing what expenses might run in this case, but thought that the Johnsons could use the $45,000 they received in settlement from Hunter's insurance carrier to pay initial expenses, and could pay other expenses, as they became due out of their income. In his July 10, 1997 letter to Ardis, Cheatham said that one reason he had associated the Ardis law firm was because he thought that they would be able to "control and handle" the expenses involved since Wolf Ardis had had considerable experience with automobile glass cases.

Ardis' testimony was in stark contrast to Cheatham's. Ardis testified that he and Cheatham had discussed expenses from the beginning, and that Cheatham had agreed to be responsible for half of all expenses in the case. Ardis also said that he told Cheatham that he estimated that each of them could expect to pay $200,000 in expenses. Ardis said that he first became aware that Cheatham denied responsibility for half the expenses in July 1997. Until that point, he said, he thought that Cheatham would honor their agreement to split the expenses 50/50. Ardis testified that, at a meeting in Nashville in the summer of 1997, Cheatham admitted to him that Cheatham was responsible for half the third party expenses.

The trial court noted that there was no written agreement on the payment of expenses, and made no finding as to any oral agreement between Cheatham and Ardis on the expenses. From the record, it is clear that both Cheatham and Ardis understood that the expenses in the product liability portion of the case would be substantial. Ardis testified that he told Cheatham that both of them could expect to advance at least $200,000 in expenses. Cheatham denied this, but acknowledged that he knew that the expenses in a lawsuit of this type made it imperative to have a large amount of potential damages in

order to make the lawsuit worthwhile. He testified that he assumed that the Johnsons would pay initial expenses with the $45,000 settlement they received from Hunter's insurance carrier. The actual expenses totaled over $800,000. Advancing expenses of this magnitude in a contingency fee case is clearly an important part of the risk the lawyer assumes in agreeing to take such a case. Agreement on who would advance these expenses must be deemed an essential term of the contract between Cheatham and Ardis. Without a meeting of the minds on this term, the agreement is too vague and indefinite to be enforced. *See ConAgra Poultry Co.*, 832 S.W.2d at 554. Without a valid contract, there can be no joint venture. *See Spencer Kellogg*, 315 S.W.2d at 520.

Absent an enforceable contract, the attorney's fees must be allocated under the theory of *quantum meruit*, which is an equitable substitute for a contract claim. *See Castelli,* 910 S.W.2d at 427. "A party who had a contract at one time may pursue a *quantum meruit* recovery if the contract is no longer enforceable." *Id.* A party can recover pursuant to *quantum meruit* under the following circumstances:

(1) there must be no existing, enforceable contract between the parties covering the same subject matter,
(2) the party seeking recovery must prove that it provided valuable goods and services,
(3) the party to be charged must have received the goods and services,
(4) the circumstances must indicate that the parties involved in the transaction should have reasonably understood that the person providing the goods or services expected to be compensated, and
(5) the circumstances must also demonstrate that it would be unjust for the party benefitting from the goods or services to retain them without paying for them.

*Id.* (citations omitted).

As noted above, there was no enforceable contract between Cheatham and Ardis. The record reflects, and the trial court found, that Cheatham provided valuable services. Although the parties did not agree on the amount of the fees to which Cheatham was entitled, they clearly agreed that he would be compensated for the work he performed. There is no dispute that Ardis benefitted from the services provided by Cheatham. The Tennessee Supreme Court has approved of recovery under *quantum meruit* in a situation in which the attorney's fee contract is unenforceable:

We agree that attorneys should not be penalized for innocent snafus, such as an oversight in

drafting that might render their fee contracts unenforceable. To do so would be unfair to the lawyer who had otherwise diligently pursued the client's interests, and it would result in a windfall to the client who had benefitted from these services. Thus, a recovery under a theory of *quantum meruit* is warranted in these situations.

*White v. McBride*, 937 S.W.2d 796, 803 (Tenn. 1996). Under these circumstances, we find that

Cheatham's attorney's fee should be determined based on the theory of *quantum meruit.*

Recovery under the theory of *quantum meruit* is limited to the actual value of services

rendered. *See Castelli*, 910 S.W.2d at 428. Cheatham testified that he did not keep hourly billing

records for his time spent on the case because it was a contingency fee case. DR 2-106 lists factors on which a reasonable fee can be based:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
(3) The fee customarily charged in the locality for similar legal services.
(4) The amount involved and the results obtained.
(5) The time limitations imposed by the client or by the circumstances.
(6) The nature and length of the professional relationship with the client.
(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
(8) Whether the fee is fixed or contingent.

Sup. Ct. Rule, Code of Prof. Resp. DR 2-106; *see also Connors v. Connors*, 594 S.W.2d 672, 676-77 (Tenn. 1980) (citing DR 2-106). We find that these factors are applicable to the determination of Cheatham's attorney's fees under the theory of *quantum meruit*.

At the September hearing on attorney's fees, the trial court considered several factors that are included in DR-2-106. The trial court discussed Cheatham's significant contributions to the case, including the fact that he laid the groundwork on the case, the time that he spent working on the case, and the expenses that he paid. The trial court also noted that at the time of Cheatham's withdrawal from the case, the highest settlement offer that had been proposed was $300,000. However, because the trial court utilized a joint venture analysis rather than determining the fee based on *quantum meruit*, findings were not made regarding several factors listed under DR 2-106. For example, the trial court made no findings as to the skill involved in the work Cheatham performed, the extent to which Cheatham's work for the Johnsons precluded him from working on other cases, the fee customarily charged in Nashville for similar legal services, or the nature and length of Cheatham's professional relationship with the Johnsons. Therefore, the factual findings by the trial court are not sufficient for this Court to determine the amount of a reasonable attorney's fee pursuant to DR 2-106. Consequently, we must remand this case to the trial court for a reasonable division of the contingency fee in accordance with the factors listed in DR 2-106. On remand, the trial court should take into consideration the fact that

Cheatham did not participate in the majority of the preparation for trial in this case.

Ardis raises additional issues on appeal, such as whether the application of joint venture law is inconsistent with Disciplinary Rule 2-107 of the Tennessee Code of Professional Responsibility. All remaining issues are pretermitted by our holding, and it is unnecessary to address them. In sum, the record indicates that Cheatham and Ardis had no meeting of the minds on the advancement of expenses, which was an essential term of their agreement. The failure to agree on this essential term causes the parties' contract to be unenforceable. Therefore, the law of joint venture is inapplicable and Cheatham's attorney's fees must be based on the value of the services rendered under the theory of *quantum meruit*. The trial court's award to Cheatham of one-third of the contingency fee is reversed. This case is remanded for the trial court to make a reasonable division of the contingency fee under the theory of *quantum meruit* and based on the factors listed in DR 2-106.

The decision of the trial court is reversed and remanded as set forth above. Costs are taxed to Appellee, for which execution may issue if necessary.


_____ **HOLLY KIRBY LILLARD, J.**

**CONCUR:**


_____
**W. FRANK CRAWFORD, P. J., W.S.**


_____
**DAVID R. FARMER, J.**