# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON

JOEL R. SUMMERS,

        Plaintiff/Appellee,

VS.

LISA CAROL SUMMERS,

        Defendant/Appellant.

)
)
) Carroll Chancery No. 96-DR-123
)
) Appeal No. 02A01-9709-CH-00230
)
)
)
)
)

FILED

October 14, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

APPEAL FROM THE CHANCERY COURT OF CARROLL COUNTY
AT HUNTINGDON, TENNESSEE
THE HONORABLE WALTON WEST, CHANCELLOR

C. DAVID JONES
THE JONES LAW FIRM
Huntingdon, Tennessee
Attorney for Appellant

STEVEN L. WEST
WEST & WEST ATTORNEYS
McKenzie, Tennessee
Attorney for Appellee

**AFFIRMED**

ALAN E. HIGHERS, J.

**CONCUR:**

**W. FRANK CRAWFORD, P.J., W.S.**

**DAVID R. FARMER, J.**

Defendant, Lisa Carol Summers, (hereinafter referred to as "Wife" or "Ms.

Summers") appeals the trial court's order granting divorce to both parties, awarding custody of the minor child, Joseph, to Plaintiff, Joel Russell Summers (hereinafter referred to as "Husband" or "Mr. Summers"), awarding the marital residence to Husband, valuing the marital residence at $130,000.00, and awarding Husband a lien against one half of the child support arrearage Wife might collect for her two children from a previous marriage.

## I. Factual and Procedural History

The parties were married in 1984. Wife had two children from a previous marriage, a son, age 18 at the time of trial, and a daughter, age 15 at the time of trial. One child was born of the marriage, a son, born August 1992.

During the parties' marriage, Wife attended college beginning in 1986. She graduated in 1990. During the process of Wife's obtaining a college degree, Husband assisted in supporting his wife and rearing of her two children.

Husband complains that serious problems began between the parties in January of 1996. He objected to his wife staying away from home overnight on what he considered a frequent basis. He insists that Wife did not consult him about these business and personal trips nor did she ask him to accompany her. He further contends that his wife would not reveal the location where she was staying on these trips, providing him only with a beeper number of the woman traveling with her. He maintains that Wife pursued her own interests while he stayed at home with the children.

Additionally, Husband complained that Wife frequented drag races wearing "tight tops" and "tight shorts" which he considered inappropriate attire. He further objected to Wife's intentions to get a tattoo and complained that Wife was dressing like a teenager and paying unusual attention to tanning, running, and walking.

Husband testified that when Wife was taking up night classes, she would often return home during the early morning hours even though her classes were finished at 9:00

2

p.m. He further alleged that Wife had a "hickey" on her neck upon arriving home after one of her business trips to Murfreesboro, Tennessee.

Wife denied all of the above alleged acts or conduct on her part.

Husband admitted asking his wife if she was having an affair with one man and questioning her about an affair with another man and with another woman. In January 1996, Wife moved out of the house due to the parties' arguing and stayed gone for five days. Wife's son from a previous marriage remained in the home of the Husband during that time period. Wife returned to the marital home for the sake of her daughter from a previous marriage and for the sake of the parties' son. Thereafter, there was not much of a relationship between the parties.

As mentioned above, Wife began taking night classes in Jackson, Tennessee, in April of 1995. This lasted for several months. Wife testified that she left immediately after the classes were over and went directly home.

Wife works in the computer industry. Her job has required that she travel overnight for various projects and assignments. She testified that in the summer of 1995 her husband became agitated due to her trips and because she would bring work home with her due to her increased responsibility. In July 1995, Wife had to be away from home for approximately one week due to a job assignment. Thereafter, in September of 1995, she had to again be away from home for approximately one week, and she says her husband became "irate" because she was having to stay away from home.

Wife stated that Husband is envious of her job. She also indicated that Husband preferred staying home rather than taking trips. During the course of her business assignments, she has been to California, Las Vegas, and on five or six occasions to New York. Trips to Mexico may be in her future with her present employer.

3

Wife denies any affairs with co-workers but acknowledges that fact that there were rumors at her place of employment concerning a co-worker and herself. In addition to the above, Husband inspected Wife's underwear, and based on these inspections, made certain accusations about wife's sexual involvement with another person. Wife testified that these accusations made her "feel awful." She was hurt by the fact that her husband would examine her underwear with these suspicions.

Dustin Vaughn, the eldest son of Mrs. Summers, testified that he and Mr. Summers had a good relationship and that Mr. Summers had always treated him good and helped to provide for him as well as his sister. He also testified that during the twelve years that Mr. Summers helped to care for him that he had not had any contact with his biological father, and that his biological father had not provided any support for him. Dustin also testified that Mr. Summers was a "good" dad and got along with Joseph (the minor son of the parties) "great."

Dustin also testified that there was one occasion that there was a party at Mrs. Summers' home after the separation where there were kids at the party under the age of twenty-one who were drinking alcoholic beverages. Dustin stated that he had not asked his mother permission to have a drinking party but that his mother had said to him on prior occasions that she would rather have him and his friends drink at her home where they would not be out driving. Dustin indicated that some of those who had been at Mrs. Summers' house drove their cars home. Dustin also indicated that at the time he lived at Mr. Summers' home when friends came over there was never any drinking in the home of Mr. Summers.

Dustin testified that Mr. Summers was the individual who primarily took care of the discipline in the home. He testified that Mr. and Mrs. Summers shared the housework at the time they lived together.

Dustin testified that he felt welcome to go visit with Mr. Summers and to go see him

4

and that he could go over to see Joseph any time he wanted to. He also testified that he worked two jobs and that when he was not working he did other things that eighteen year olds do such as "tour the strip," go to his girlfriend's house, and call his friends on his car phone. He sees Joseph around his other schedule.

The minor daughter of Mrs. Summers, Emily, testified that she and Mr. Summers got along "ok" and even though he was her step-dad that he treated her like a "dad" would. She testified that Mr. Summers was a good father to Joseph. She testified that Mr. Summers did cooking cleaning and "stuff like that." She also testified that she felt comfortable in calling Mr. Summers if she needed anything and that she would feel comfortable going to his house to visit with the minor child Joseph, although she would prefer to have Joseph live with her at her house.

Jessica Ward, friend of Emily Summers, testified that pursuant to conversations with Emily, she felt that Emily wanted Joseph to live with Mr. Summers in that she did not want to have to be responsible for Joseph. Emily denied any such statements to, or conversations with, Jessica.

There was testimony from Joseph's day care teacher that Joseph and Mr. Summers had a good relationship and that Joseph always wanted to give his dad a hug. Linda Summers, sister-in-law of Mr. Summers, testified that in her opinion it would be in Joseph's best interest to be with his father. It was her opinion that Mr. Summers had pretty much raised the child and was always there for Joseph and had made accommodations for the child. She testified that she and her husband were willing to watch Joseph at Mr. Summers home on those occasions when he might be called into work at night.

Cindy Summers, sister of Mr. Summers, testified that she is a teacher at Bethel College, where she teaches sociology and has a degree in education with preschool and elementary certification, with a graduate degree in social work. She testified that when Mr. Summers and his son Joseph are together that Joseph is calm, that he listens, that he interacts well with the people he is with, that he shares and is calm and peaceful, and is

5

very pleasant to be around. She also testified that in her observations of Joseph when he is around his mother, Joseph would scream and be very loud, unsettled and attention seeking with a lot of acting out behaviors. She testified that Mr. Summers had been Joseph's caretaker all of Joseph's life and that Mr. Summers also raised Mrs. Summers' other two children. She indicated the child would be better off with Mr. Summers in that he was the stabilizer and is a very positive force in the child's life and puts the child first.

Terry King, sister of Mrs. Summers, testified that the parties took care of Joseph 50-50. She testified that Mrs. Summers is a good and responsible mother, that Mrs. Summers loves Joseph dearly, and that she and Joseph have a very good relationship.

Dorothy Coleman, mother of Mrs. Summers, testified that Joseph interacts with his mother, brother and sister and is very happy with them. She testified that he receives love and affection and that he is also disciplined and is being taught the difference between right and wrong.

There was also testimony of the work schedules and work commitments of both Husband and Wife. Husband works as a mortician at a funeral home. His job responsibilities include picking up bodies from the local hospitals and embalming them at the funeral home. During the marriage he was frequently "on call" and therefore could be called away on work at any time of the night. Mr. Summers testified that if he was awarded custody of Joseph, his work schedule would change so that he would only be on call one night each week and on alternating weekends. He also testified that his brother and his brother's wife would watch Joseph at his home for any hours that he was called away for work so that his son would not have to be awakened from his sleep. He testified that if he was awarded custody of Joseph, there would not really be any change in his son's schedule.

There was much testimony on the business trips which were taken by Mrs. Summers. Mrs. Summers testified that she will not be traveling for business in the future.

Kathy Mann, work supervisor of Mrs. Summers, testified that overnight stays at some of the stores were necessary and that it is a continuing part of Mrs. Summers' job and she will be required to do that in the future. She later testified that another employee will be the one normally going on the trips to the outlet stores, but Mrs. Summers will have to go if it is involved with the plant and Ms. Mann is unable to go. There was testimony that Mrs. Summers would attend a seminar or conference once a year. Mrs. Summers may also have to go to Mexico for a week to train the employees there.

In the Memorandum Opinion, the trial court held there was sufficient evidence to grant a divorce to both parties. On the custody issue, the trial court noted that both parents have contributed significantly to the rearing and upbringing of their son. The trial court also noted that it is apparent that both parents love their son very much and have developed a positive relationship with him. The trial court stated that both parents are suitable and proper parents to have custody of their child. The court then found that Mr. Summers may be in a position to provide a more stable home environment in the future and for remaining in the area with family members considering his type of employment as compared to Mrs. Summers, primarily due to her travel requirements and relocation possibilities. The trial court awarded custody to Mr. Summers with Mrs. Summers being allowed liberal visitation.

The marital residence consists of a house and a 128-acre farm. Mr. Summers gave his opinion that the fair market value of the property was $115,000. He testified that this value was a higher value than the value placed upon the home for tax purposes, and that he considered the price that others had indicated they would be willing to pay for the property. Mrs. Summers wished to put on appraisal testimony that the house was worth $144,000. However, the Chancellor had told the attorneys to put on all their proof as it related to the property issues at the February 1997 phase of the trial and would not allow this appraisal testimony at the later hearing date. Mrs. Summers then testified that the property was worth $144,000 in her opinion. The trial court valued the property at $130,000, awarded the marital residence to Mr. Summers and ordered that he pay Mrs. Summers her half interest in the equity within sixty (60) days from entry of the judgment.

7

There was also testimony in the case regarding child support due to Mrs. Summers from her previous Husband for the support of Mrs. Summers two children, Dustin and Emily. There was a child support order which required the father of these children to pay the sum of $200.00 per month as support. He did not make any payments during the course of this marriage between Mr. and Mrs. Summers. There was testimony that Mr. Summers supported them financially and assisted in their rearing as a father would do. The trial court awarded Mr. Summers a lien on one half of any future recovery of this past due child support by Mrs. Summers.

This appeal by Mrs. Summers followed.

## II. Divorce

Findings of facts are reviewed *de novo* with a presumption of correctness. Wife contends that the trial court should have granted the divorce solely to her. Tennessee Code Annotated §36-4-129(b) gives the Chancellor authority to grant the divorce to both parties if upon the proof both parties are entitled to a divorce. Every intendment is in favor of the correctness of the decree of the trial court. Farrar v. Farrar, 553 S.W.2d 741, 743 (Tenn. 1977).

The trial court found that there was insufficient evidence presented for the court to conclude that Mrs. Summers was not faithful. However, the trial court found that circumstances existed which would have justified Mr. Summers questioning the fidelity of his wife. The Court then stated that Mr. Summers was not understanding of the nature of his wife's job which necessitated frequent travel. Mr. Summers made accusations about his wife's conduct which often were not based on fact. The trial court found that both parties contributed to the dissolution to the extent that both should be granted the divorce.

There was testimony that Wife took several overnight trips without Husband. Husband was never invited along on these trips. There was testimony that Wife drank and went out to dance clubs during some of these overnight trips. Wife returned from one

overnight trip with a bruise on her neck that resembled a "hickey." Husband testified that Wife would act differently toward him upon her return from these trips. There was testimony that rumors were circulating at Wife's job regarding Wife and a co-worker. Sexual relations between the parties became almost nonexistent, and Wife frequently did not sleep in the same bed as Husband. There was testimony that Wife frequented drag racing events, where Husband stated she would wear tight tops and tight shorts which he thought were inappropriate attire.

While there was no direct proof that Wife was unfaithful, there was equally insufficient evidence to conclude that she was not unfaithful. The trial judge in this case had to base his judgment and findings upon oral testimony. The trial judge thus had to assess the credibility of the parties. While many of the facts in this case were disputed by the parties, such findings on review must be regarded as conclusive unless other real evidence compels a contrary conclusion. McReynolds v. Cherokee Ins. Co., 815 S.W.2d 208, 210 (Tenn. App. 1991); Airline Constr., Inc. v. Barr, 807 S.W.2d 247, 264 (Tenn. App. 1990). The trial court found that circumstances existed which would have justified Mr. Summers' questioning the fidelity of his wife. We hold that the evidence does not preponderate against this finding and the Trial Court did not err in granting a divorce to both parties.

### III. Custody of Minor Child

The parties have a son who was near age five at the time of the divorce. The trial court awarded custody to Husband. Wife contends that the trial court erred in this determination of custody.

In child custody cases, appellate review is de novo upon the record, with a presumption of correctness of the trial court's factual findings. Tenn. R. App. P. 13(d); Hass v. Knighton, 676 S.W.2d 554, 555 (Tenn. 1984). The paramount concern in child custody cases is the welfare and best interest of the child. Bah v. Bah, 668 S.W.2d 663 (Tenn. Ct.

App. 1983). The goal of every custody proceeding is to place the child in an environment that will best serve his or her physical and emotional needs. Lentz v. Lentz, 717 S.W.2d 876, 877 (Tenn. 1986). In determining where the best interest of the child lies when awarding custody, the court considers many factors. A nonexclusive list of such factors can be found in Bah v. Bah at 666.

> To arrive at the point of deciding with whom to place a child in preparation for a caring and productive adult life requires consideration of many relevant factors, including but certainly not limited to the age, habits, mental and emotional make-up of the child and those parties competing for custody; the education and experience of those seeking to raise the child; their character and propensities as evidenced by their past conduct; the financial and physical circumstances available in the home of each party seeking custody and the special requirements of the child; the availability and extent of third party support; the associations and influences to which the child is most likely to be exposed in the alternatives afforded, both positive and negative; and where is the greater likelihood of an environment for the child of love, warmth, stability, support, consistency, care and concern, and physical and spiritual nurture.

As a general rule it is not good to separate minor children. Terry v. Terry, 361 S.W.2d 500, 504 (Tenn. Ct. App. 1960). In the case at hand, Husband was awarded custody of the parties' five year old son. Wife had two children by a previous marriage that remained in her custody. The children, a girl and a boy, were ages 15 and 18 respectively at the time of the divorce. The trial court cited a case in which the court held that where children were of different sexes, and where there was an age difference of six (6) years, it was not as important for the two children to remain together in the same custodial domicile as it would have been if they were much closer in age and were of the same sex. Cease v. Cease, Slip Opinion, (Ct. App. M.S., Nov. 1981).

In the case of Dodd v. Dodd, 737 S.W.2d 286 (Tenn. Ct. App. 1987), the parties had three minor children and the court awarded custody of one daughter to the Husband and the other two daughters to the Wife. The Guardian Ad Litem was of the opinion that the younger two sisters were closer to each other than to the older sister. While their respective ages were not mentioned, the GAL commented that "considering the comparative ages of the children, this is understandable." Id. at 291. The court in Dodd stated that it must consider the welfare and best interests of these children as individuals,

not as a group of three. Id. The court found that while both parents were fit parents, it was in the best interest of the eldest child to be placed in the custody of her father. The court found that the younger two daughters, being closer in age, enjoy a close relationship, and should be kept together in the custody of the mother. Id.

In the case at hand, the parties' son is age five and his half-sister is age 15. There was testimony, although disputed, that the half-sister Emily, while loving her half-brother, did not want to have to be responsible for him. There was testimony from Emily that she felt comfortable in calling Mr. Summers if she needed anything and that she would feel comfortable going to his house to visit with the minor child Joseph.

Wife also contends that the trial court should have considered, in the case of this child of tender years, the gender of the parent, namely, the mother, as a factor in determining custody of the child. At the time this case was heard, Tenn. Code Ann.§36-6-101(d) read as follows:

> It is the legislative intent that the gender of the party seeking custody shall not give rise to a presumption of parental fitness or cause a presumption in favor or against the award of custody to such party; provided, that in the case of a child of tender years, the gender of the parent may be considered by the court as a factor in determining custody after an examination of the fitness of each party seeking custody.

In July of 1997, the statute was amended inserting the language "or constitute a factor" and deleting any reference to the former language constituting the "tender years doctrine" thus eliminating any gender-based preference. However, even under the Statute as it read at the time of trial, no presumption of parental fitness existed in favor of the mother. There is no evidence in the record that the trial court did or did not consider tender years as a factor in making its determination. However, the statute reads that such a factor *may* be considered by the court. Therefore, even if the trial court did not choose to consider this as a factor, this Court finds no error with such action.

The various factors to consider in custody decisions are set out in Tenn.Code Ann. §36-6-106. After applying the factors to the present case, the trial court was unable to

11

ascertain any real distinctions between the parties as relates to their parenting abilities and the best interest of the child. The trial court did find that during the course of the marriage that Mr. Summers had to assume more individual responsibility for his son and step-children on various occasions due to business and personal trips taken by Mrs. Summers and that he was a competent parent during these times. The trial court then stated that Mr. Summers may be in a position to provide a more stable home environment in the future and for remaining in the area with family members considering his type of employment as compared to Mrs. Summers, primarily due to her travel requirements and relocation possibilities. The trial court ultimately awarded custody to Mr. Summers.

The factual findings of the trial court are entitled to a presumption of correctness. Trial Courts are vested with wide discretion in matters of child custody and the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion. Koch v. Koch, 874 S.W.2d 571 (Tenn. Ct. App. 1993). There were many disputed facts in this case which called the credibility of the witnesses into account. Based upon the foregoing standards of review, and upon careful consideration of the record, this Court finds that the evidence does not preponderate against the trial court's ruling and affirms the award of custody to Husband.

## IV. Marital Residence

The trial court awarded the real property to Husband and ordered him to pay to Wife her one half interest in the equity within sixty (60) days from the entry of the judgment. Wife argues that the trial court should have ordered the property sold or, alternatively, valued the property at $144,000.00.

Property division is reviewed de novo with a presumption of correctness. Allowing the party granted custody to remain in the marital residence is common in property divisions. Tennessee Code Annotated §36-4-121(d) states, "The court may award the family home and household effects, or the right to live therein and use the household

12

effects for a reasonable period, to either party, *but shall give special consideration to a spouse having physical custody of a child or children of the marriage.*" As this Court has affirmed the award of custody of the minor child to Husband, this Court also affirms the trial court's holding allowing Husband to retain the marital residence.

The trial court found the value of the real property to be the sum of $130,000.00. The Husband testified that in his opinion the real property was worth $115,000.00. Wife testified that the real property was worth $144,000.00. The trial judge apparently split the difference to arrive at the value of $130,000.00. Wife argues that the testimony of the appraiser should have been allowed to establish the value at $144,000.00.

This case was tried to the judge on several different dates. At the hearing on March 19, 1997, Wife tried to offer into evidence the appraisal which was done on the house. Husband's attorney objected on the grounds that this matter should have been discussed at the previous hearing (February 1997), and it was agreed and understood that only the parties and possibly Mr. Drewry would be testifying at the present hearing. The trial judge stated the following:

> I've already indicated to you all by phone conference, and we can address it later, and I'll state it for the record now-- that I told you all then to put on all your proof as relates to the property issues, and it was clearly understood that I was going to continue the matter today for matters of custody and testimony between the parties as relates to property and -- and then to, as I've indicated to you, to come in after the fact now and start wanting to have appraisals or other testimony, in my opinion, is not an appropriate procedure, and I've already indicated that to you by phone and I'm not going to allow the appraisal today for the purposes of this hearing. Not that I'd consider the appraisal -- I don't even know what it is. It's just a matter as I indicated to you, Mr. Jones and Mr. West, a matter procedurally that was not the understanding that we had. And there was no just cause given to the Court as to why it could not have been done prior to the last hearing when the matter was set for trial. And had there been some reason given, the Court certainly might have considered it. But as I recall, there was no reason given. And again, I emphasize that when I set a case for trial, I expect it to be ready to go for trial as far as all elements of proof are concerned and not be taking testimony and -- after the trial has started under these circumstances.

One of the most important functions of a trial judge is to control the admission of the

13

evidence. Trial judges have broad discretion over the admissibility of evidence, <u>Otis v. Cambridge Mut. Fire Ins. Co.</u>, 850 S.W.2d 439, 442 (Tenn.1992); <u>Witter v. Nesbit</u>, 878 S.W.2d 116, 122 (Tenn. Ct. App.1993), and the order of the proof. <u>Morris v. Swaney</u>, 54 Tenn. (7 Heisk.) 591, 595 (1872); <u>Long v. Tomlin</u>, 22 Tenn. App. 607, 623, 125 S.W.2d 171, 181 (1938). The matter of establishing the order of proof is within the Trial Court's sound discretion and will be reversed only when the trial judge has abused that discretion and where it can be demonstrated that the error has affected the substantial rights of one or both parties. Tenn. R. Evid. 103(a); <u>Castelli v. Lien</u>, 910 S.W.2d 420 (Tenn. Ct. App.1995); <u>Bowers v. Bowers</u>, 956 S.W.2d 496, 499 (Tenn. Ct. App. 1997).

Both parties were given the opportunity to present evidence on the value of the home at the February 5, 1997 hearing in this matter. Both parties were aware that the matter was set for trial on February 5, 1997 and both parties called witnesses at this hearing. Neither party had an appraisal as of the February trial date. The trial lasted longer than one day and the Judge expressed that the next hearing would be for the purpose of hearing testimony from the parties. The trial judge stated that had just cause been given to the Court as to why the appraisal could not have been done prior to the last hearing when the matter was set for trial, he certainly might have allowed the testimony. However, no reason was given by Wife. Both parties put on evidence as to their opinion of the value of the property. This Court finds that the trial judge did not abuse his discretion and the value of the property shall stand at $130,000.00.

Wife argues that the farm has lost money over the past three years and that the property should be sold at auction, where it would bring a fair market price. Wife testified that according to the parties' income tax returns, the property had lost more than twenty thousand dollars over three years. On cross examination, it was brought out that the farm loss as reflected on the parties' income tax returns may have been the product of depreciation and other allowable deductions. However, as this Court has affirmed the value placed upon the property by the trial court, the issue of whether the farm is losing money is largely irrelevant. The trial court valued the property at $130,000.00, subtracted

14

the debt on the property of $28,000.00 and found the net equity to be $102,000.00. The trial court ordered the Husband to pay to the Wife her one half interest ($51,000.00) in the property. Therefore, Wife will receive her one half interest in the property as it was valued at the time of divorce. Whether the farm loses money or gains money in the future has no bearing upon the amount awarded to Wife.

This Court affirms the judgment of the trial court awarding the marital residence to Husband, with payment owing to Wife of her one half interest in the property. This Court further affirms the findings of the trial court as they relate to the value of the marital residence.

_____

## V.  Lien on Future Child Support Recovery

During the marriage Husband helped provide for the support of the two minor children of Wife by a former marriage. This fact was not disputed at trial. The former husband of Wife failed to pay any child support to her during the course of the parties' marriage and an arrearage accumulated during the marriage in the amount of $28,000.00. The trial court awarded Husband a lien on one-half of any future recovery of this $28,000.00 by Wife. Wife alleges that the trial court erred in this award and that such award would grant a stepparent a windfall profit by taking support away from stepchildren in case the relationship sours.

Husband testified that he voluntarily provided love and support to his step-children. He asserts that Wife would be granted a windfall profit if she were allowed to collect support in its entirety for the twelve-year period in which Husband had supported the family in whole or in part. Husband maintains that this asset should remain equally divided among the parties.

15

The trial court stated that Mrs. Summers' prior divorce judgment with her former husband and father of her two children was and is an executable and enforceable judgment for child support. The trial judge cited Redmond v. Grunow, 898 S.W.2d 229, 231 (Tenn. 1995) which supports that conclusion. The trial court held that the arrearage accumulated during the marriage of Husband and Wife is deemed to be an asset in the form of a judgment acquired by Wife during the marriage.

This appears to be a case of first impression in Tennessee. Tennessee Code Annotated §36-5-101 states in pertinent part:

> (a) (5) Any order for child support shall be a judgment entitled to be enforced as any other judgment of a court of this state and shall be entitled to full faith and credit in this state and in any other state. Such judgment shall not be subject to modification as to any time period or any amounts due prior to the date that an action for modification is filed and notice of the action has been mailed to the last known address of the opposing parties. *If the full amount of child support is not paid by the date upon which the ordered support is due, the unpaid amount is in arrears and shall become a judgment for the unpaid amounts* and shall accrue interest from the date of the arrearage at the rate of twelve percent (12%) per annum. All interest which accumulates on arrearages shall be considered child support. Computation of interest shall not be the responsibility of the clerk.

Thus, when support is not paid by the date it is due, it is automatically converted into a judgment for such arrearage by operation of law.

The judgment in Wife's prior divorce ordered the father of the children to pay the sum of $200 per month as child support. Each month that support was not paid by the father of the children, the amount of arrears became an enforceable judgment. The parties were married while this arrearage accrued and the judgments became enforceable. Therefore, such arrearage was an asset in the form of a judgment acquired by Wife during the marriage.

This Court is mindful that child support is for the primary purpose of supporting the child. However, the award of the trial court does not take present or future support away from the two children. The award is designed to reimburse Husband for past support of the

16

children in the event there is a recovery of such support. There was evidence presented that Husband stepped in and took the place of the father of these children and provided the support which was not forthcoming from the father. The trial court awarded Father reimbursement of that support only in the event that Wife recovers such support from the father of the children.

In the case of Hoyle v. Wilson, 746 S.W.2d 665 (Tenn. 1988) the Tennessee Supreme Court stated that the child support obligee does not have to show that arrearages would be used for the benefit of the children. The Court reaffirmed the existing law that no such showing is ordinarily required because enforcement of arrearages constitutes a form of reimbursement for the obligee's assumption of the entire duty of support during the period covered by the arrearages. Id. at 677. In the case at hand, Husband and Wife assumed the entire duty of support of Wife's two minor children throughout the duration of their marriage. Both parties are equally entitled to reimbursement for their assumption of such duty if there is a recovery of such arrearage.

In the case at hand there was uncontroverted evidence that Husband supported the children of the Wife during the marriage and that the children did not lead a lesser lifestyle due to the non-support of the father. If this were a case where the stepparent did not provide adequate support to the stepchildren or the support provided by the stepparent was not comparable to the support which was due by the obligor parent, the stepparent might not be so entitled to share in the recovery of arrearages. This Court does not address that issue. Nor does this Court address the issue of whether a stepparent would be entitled to maintain his or her own cause of action against the obligor parent for recovery of arrearages. Those issues are not before this Court at this time and we accordingly do not express any opinion on such issues.

We hold that the trial court did not err in granting Husband a lien on one-half of any future recovery of the $28,000.00 recovered by Wife.

17

_____

### VI.  Conclusion

The trial court's judgment is hereby affirmed. Costs of this appeal are taxed to Wife, for which execution may issue if necessary.

_____
HIGHERS, J.

CONCUR:

_____
CRAWFORD, P.J., W.S.

_____
FARMER, J.