## J. W. WELCH v. W. W. DILLON & COMPANY.

Middle Section.   February 21, 1928.

Roberts & Roberts, of Nashville, for appellant.
McGugin, Evans & Cate, of Nashville, for appellee.

FAW, P. J.   In this case, the Chancellor held on final hearing that the allegations of complainant's bill are fully met and denied by the answer and are not sustained by the proof, and he dismissed complainant's bill and taxed the cost to complainant and the surety on his prosecution bond.   Complainant has appealed and assigned errors upon the opinion and decree of the Chancellor.

The material facts of the case will appear from the written "Findings and Opinion" of the Chancellor, which is in these words:

"This is a suit for money had and received and grows out of the following state of facts:

"J. H. Smith owned real estate at Monterey, Tennessee, and being in straitened financial circumstances and desirous of disposing of his land, employed W. W. Dillon & Co., a firm of real estate brokers at Nashville, to conduct and hold an auction sale on the premises. After making advertisement of the proposed sale the brokers, on November 28, 1923, on the premises, offered the property, consisting of ten acres, to the highest bidder, upon terms of one-fourth cash, remainder in three equal installments maturing in six, twelve and eighteen months, when and where the complainant J. W. Welch bid off the property at the price of $2325. All parties preceding the sale had information that there were incumbrances on the land which would have to be released before the deed was passed and cash and notes delivered.

"While J. W. Welch bid off the property in his own name and alone signed the memorandum, his undisputed testimony is that he bid for himself and a Mr. Pugh, the latter holding the only encumbrance on six of the ten acres. Welch testifies that he and Pugh were interested in the bid on a 'fifty-fifty basis.'

"At the conclusion of the auction, Welch, the accepted bidder, and Smith, the owner entered into a written memorandum in terms following:

" 'For and in consideration of the sum of $2325 to be paid as follows, one-fourth cash, balance to be paid in three equal installments at six, twelve, eighteen months from the date of sale, with six per cent interest, payable semi-annually, vendor's lien retained, the undersigned owner or owners, J. H. Smith have sold through W. W. Dillon & Co., Real Estate Brokers, and agree to convey by a sufficient warranty deed (here follows a description of the property).

" 'And the undersigned purchaser . . . agree to make said cash payment and to execute notes for said deferred payment, as soon as abstract of title can be examined, if the title is found to be good and the said vendors agree to make and deliver said deed simultaneously with the payment of said cash payment and the execution and delivery of said notes.'

"This memorandum was made upon the regular form used by Dillon & Co. in sales of this character. Either just, before or just after the memorandum was signed, I think before, Mr. Welch paid, by check, to the real estate brokers $232.50, being

ten per cent of his bid, as a deposit to guarantee his good faith and willingness to comply and to be applied as a credit upon his cash payment at time of compliance. The check was that day cashed by Dillon and it is the sum which Welch sues to recover.

"Mr. Welch testifies he understood Dillon's representative was to come to his office the same afternoon and compliance with the executory agreement there made by both parties, that is, deed delivered to him and remainder of cash and notes delivered to Smith or his brokers. Dillon's representative says his understanding was the deal was to be closed at a later date and that a bank in Monterey was to prepare the deed after the existing liens had been released. The memorandum of the executory contract bears out the idea that delivery of the deed and compliance on purchaser's part was to be made on a later day and after the purchaser had examined the title and found it to be good. This must have been so, for all parties understood there were liens to be released and they all knew that Cookeville, the county seat, was some eighteen miles away.

"As stated, Dillon cashed the check, retained broker's commission and expense of sale and paid the remainder to Smith and left for Nashville and heard nothing more of the matter until about February 7, 1924.

"The existing incumbrances were a $600-vendor's lien note held by Pugh, Welch's partner in the deal, and a $1000 note on four acres, payable to Welch's son, but held and owned at the time by a Sparta bank, the note being secured by a mortgage or deed of trust.

"It seems there should have been no trouble in securing a release of the lien of the $600 note held by Pugh, who Welch says was his partner in the sale, but as Smith was in a practical state of insolvency he was having trouble in getting the other note released, unless he could handle the proceeds of the sale to secure the release, and this the purchasers knew. On the other hand Welch was unwilling to make further payments until the incumbrances were released.

"Mr. Smith was continuing his efforts to raise money to pay off the liens and discussed the matter from time to time with Welch, and continued negotiations as appears from a letter of Smith's until about February 7, 1924.

"On December 18, 1923, and again on January 8, 1924, Mr. Welch wrote Smith suggesting methods, differing from their contract, by which the matter might be closed. In the last letter he proffers to help Smith in securing a release of the

bank's debt if Smith would pay certain accounts claimed by Welch and his son.

"At no time did Welch make demand for compliance on or by any certain date and thus matters continued until about February 7, 1924, when Welch called Dillon & Co. over the phone and gave information that the trade had not been closed or liens released, and because thereof, demanded the return of the $232.50 deposit or guaranty fund.

"So far as this record shows this is the first time Welch declared his desire to terminate negotiations or refuse Smith further time, and it certainly is the first notice to the brokers that the entire matter had not been concluded.

"On February 7, 1924, Dillon wrote Welch a rather lengthy letter in which, for themselves and their client they made the following offer:

"'We propose, if necessary, to clear this property at our own expense and present you with a deed to same upon the price and terms as agreed upon on the day of sale. I ask you what fairer proposition could we possibly make you . . . Please answer this letter by return mail or phone me and I will make arrangements to meet you at Cookeville and have release made and deliver deed to you.'

"This offer Mr. Welch declined and stated he would not accept the property even though the title was cleared.

"About the last of January or first of February, 1924, Mr. Pugh, whom Welch says was his partner in the purchase, advertised the sale of the six acres under the deed securing his vendor's lien, to be sold on February 16th.

"So at the time Dillon proposed to help Smith to buy in the incumbrances and release them and have Smith make a clear deed it was entirely within the power of Dillon and Smith to have done so. That Dillon was amply able in a financial way to carry out his proposal is shown by uncontroverted testimony.

"That Dillon could have secured ample protection by holding Welch's purchase money notes as a security, is perfectly apparent, as Welch is shown to have been a man of means and the notes were to be secured by a vendor's lien on the land.

"Upon Welch's refusal to accept Dillon's offer nothing further was done by Welch, Dillon or Smith, Pugh proceeded to foreclose his lien and the Sparta Bank foreclosed its mortgage, the land bringing only about $1700 at these foreclosure sales.

"No further offer or tender of deed and release was made by Smith or Dillon for him nor did Welch tender his notes and the balance of the cash payment. Smith has been declared a

434

bankrupt under the acts of Congress, the petition having been filed' after Welch refused the offer made by Dillon.

"This suit was brought December 11, 1924.

"It is to be observed that time, in a court of equity, is not usually deemed to be of the essence of a contract for the sale of land, especially when the parties have not contracted for performance within a given time. Kennedy v. Woolfolk, 3 Haywood, 195; Caldwell v. Winston, 3 Cooper's Chy. R., 110; 36 Cyc., 707. The contract in this case does not require performance within any fixed time and therefore time was not of its essence.

"It·is a further rule of law that if the parties did not originally make time for performance an essential part of the contract, either party not in default might make it so by notice to the other party demanding performance within a reasonable time fixed in the notice. 36 Cyc., 714.

"The proof in this case shows that no notice was given by Mr. Welch until he demanded of Dillon that return be made of the cash deposited, and he then positively refused to give any time and was equally positive in refusing the offer to accept a deed with the title cleared.

"True, neither Dillon nor Smith personally visited Welch and tendered him a deed and copies of releases of the incumbrances, but in view of Welch's firm and positive refusal to accept a clear title such tender was unnecessary and would have been a 'meaningless form.' Bradford v. Foster, 87 Tenn., 4; 36 Cyc., 702 citing cases; 27 R. C. L., 462.

"The executory contract provided that delivery of deed depended on payment of cash and delivery of notes and it is not shown that Welch ever made formal tender of cash and notes and demanded a deed.

"So this case, in my opinion, depends alone upon the right of a defaulting purchaser to recover money paid by way of a deposit or guaranty from a vendor then able and willing to comply. Counsel have not called my attention to any Tennessee case covering this precise question, in fact, have furnished no brief at all.

"In 27 R. C. L., 624, it is said:

"'If the vendor is not in default and is willing and able to perform, and the purchaser refuses to complete the transaction, he cannot as a general rule recover what he may have paid towards the purchase money . . . It is immaterial that the vendor, after the purchaser has expressly refused to complete the purchase and has renounced the contract, resells the land, as to say that the subsequent sale of the land gives a right to the purchaser to recover back the money paid on the contract

would, in effect, be saying that the vendor could never sell it without subjecting himself to an action by the purchaser.'

"That this rule is supported by both reason and the great weight of authority is shown by the opinion and lengthy annotations to Hurley v. Anicker, L. R. A., 1918-B, 538-546.

"The reason underlying the rule is that a party who has defaulted in the execution of a contract cannot come into a court of equity and standing on his own breach, recover from the party not in default.

"It cannot be said in this case that Smith agreed to or attempted to rescind. Mr. Welch puts that at rest by his own language. He gave his reasons for his stand in these words:

" 'Mr. Pugh had fully decided to file a bill and sell the land. After he told me that he had filed a bill I refused to, declined— if I ever refused I don't know it—but I declined closing the contract as I was tired of the worry.'

"For the reasons given, I am of opinion the complainant cannot recover and his bill is dismissed with costs.

"Jno. R. Aust."

Appellant Welch has assigned errors, as follows:

"1. The court erred in dismissing the bill and in taxing the complainant with the cost of the cause, for the following reasons, to-wit:

"(a) The court erred in holding that the written agreement between the complainant J. W. Welch and J. H. Smith filed as exhibit to the answer (record eight) shows on its fact that the parties contemplated 'that delivery of the deed and compliance on purchaser's part was to be made on a later day,' etc. Opinion p. 64. The said written contract shows that one-fourth of the purchase price was to be paid in cash, balance in three equal installments at six, twelve and eighteen months from date of sale.

"(b) That said written contract (record eight) makes no mention whatever of the payment of $232.50, which was then made by check to W. W. Dillon & Company; in fact, according to the construction of said written contract placed thereon by the Chancellor, this demand on the part of W. W. Dillon & Company was directly in the teeth of said written contract, and was not made in accordance with its terms.

"(c) The demand that a ten per cent payment be made by complainant on the ground of the sale, was in direct conflict with the terms and conditions of the written contract, on which the defendants rely in its answer. According to said written contract they had no legal right to demand this money; and the agreement testified to by the complainant Welch and not denied by the defendant Dillon, to the effect that it was then

and there agreed that the parties would repair to the office of complainant where the transaction would be completed and the remainder of the cash payment made, is the only theory upon which the facts can be harmonized with the written agreement, that is, that the full amount of the cash payment was to be made on that day and at the office of J. W. Welch.

"(d) The court erroneously determined that the written contract (record eight), dated November 28, 1923, which was signed by the complainant J. W. Welch on the ground where the sale had been made was controlling in this case; whereas, said contract provides that the one-fourth cash was to be paid 'as soon as abstract of title can be examined, if the title is found to be good, and the said vendors agree to make and deliver said deed simultaneously with the payment of the said cash payment and the execution and delivery of said notes.' (See contract record eight.) This cash payment here sued for was not made under and in accordance with said contract, but was made under and in accordance with a separate and distinct verbal agreement made between J. W. Welch and W. W. Dillon, Jr., by which the check for $232.50, sued on in this case, was handed to Mr. Dillon under an agreement that the parties would at once go to the office of J. W. Welch in Monterey and this check to be handed back to Mr. Welch and Mr. Welch was to complete the transaction by paying twenty-five per cent in cash; in other words, the whole transaction was to be closed at the office of Mr. Welch that afternoon. Then in violation of that agreement, which is undisputed by Mr. Dillon, Mr. Dillon went over in town to a bank, cashed the check and left for Nashville. This verbal contract was violated by the defendant Dillon.

"II. The court should have sustained the bill and rendered judgment in favor of the complainant and against the defendant for the sum of $232.50 with interest from date of the filing of the bill, together with the cost of the cause for the reasons assigned above."

After an examination of the record and briefs and of the authorities cited by the Chancellor and by counsel, we are of the opinion that the Chancellor reached the correct conclusion, and we concur therein.

In view of the record facts with reference to the incumbrances on the property in question, known to complainant Welch at the time the property was bid in by him, it is not reasonably probable that either complainant Welch or the vendor, Smith, believed at the time of the sale that it could be consummated on that day. All of the circumstances tend to the contrary conclusion.

But if it be assumed that the proof supports complainant's claim that defendant, W. W. Dillon, Jr., orally agreed with complainant, at the time the check for $232.50 was delivered to Dillon by complainant, that the parties would meet at complainant's office during the afternoon of that day and complete the transaction, it would not follow that the Chancellor's decree is erroneous; for, if there was such an agreement, it was waived by complainant, as evidenced by his conduct in thereafter continuing negotiations looking to the closing of the transaction. 36 Cyc., p. 717.

We think the foregoing opinion of the Chancellor is a sufficient answer to the appellant's assignments of error, and the assignments are all overruled.

It results that the decree of the chancery court dismissing complainant's bill and taxing the costs to complainant and the surety on his prosecution bond, is affirmed. The costs of the appeal will be adjudged against complainant and the sureties on his appeal bond.

Crownover and DeWitt, JJ., concur.