**Zoltan J. BOKOR, Plaintiff-Appellant,**

v.

**George W. HOLDER, Jr., Hoboco, Inc., and Robert N. Buchanan, III, Substitute Trustee, Defendants-Appellees.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Oct. 8, 1986.

Permission to Appeal Denied by Supreme Court Jan. 5, 1987.

Carey J. Thompson, Ashland City, for plaintiff-appellant.

C. Scott Jackson, Farris, Warfield & Kanaday, Nashville, for defendants-appellees.

## OPINION

LEWIS, Judge.

This is an appeal by plaintiff Zoltan J. Bokor (Bokor) from the dismissal of his suit in which he sought a declaratory judgment as to his rights under an agreement and promissory note. In the event the court should find that he was "without any remaining rights under the agreement," he sought in the alternative, "a monetary judgment for his services rendered ... on the basis of quantum meruit."

Following a bench trial, the trial court dismissed plaintiff's complaint, finding that the forfeiture provisions of the agreement between Bokor and defendant George W. Holder, Jr. (Holder) and the promissory note executed by Bokor in favor of Holder were valid and that Bokor "has no further claim against or interest in the property." The trial court also found that Bokor had failed to carry his burden of proof of showing that he was entitled to a money judgment on the basis of quantum meruit. We affirm.

The pertinent facts are as follows:

Bokor, a land developer and builder, knew of 68.9 acres of land in Davidson County that could be purchased and developed as a subdivision. Bokor did not have sufficient funds to purchase and develop the land.

Through a mutual acquaintance, Bokor and Holder were introduced. Bokor informed Holder that the only money needed to get the venture under way was $280,000 to be used for the purchase of the property and that all development costs would be met from the proceeds of the sale of lots which Bokor said he already had lined up. Bokor assured Holder that the sale of seventy-two lots at $12,000 each were ready to close.

Bokor and Holder were each to contribute $140,000, one-half of the purchase price. Bokor was to obtain a bank loan from a Brentwood, Tennessee, bank for his $140,000. However, his loan did not materialize and Bokor was able to come forth with only $40,000.

On June 8, 1983, Bokor and Holder entered into an agreement to purchase and develop the 68.9 acres of land as a subdivision to be known as Harbor Gate.

Paragraph 2 of the agreement provided that Holder would lend Bokor $100,000. Paragraph 4 provided that if lot sales were not sufficient to meet cash-flow needs, then the parties would contribute an amount "sufficient to cover such needs." Of this amount, Bokor was to contribute 53.75 percent and Holder 46.25 percent.

Paragraph 5 of the agreement provided: "In event Bokor fails to contribute any amount required under paragraph 2 or 4 above, Holder, at his option, may become the sole owner of the property and Bokor will forfeit any further interest in the property."

On June 16, 1983, Bokor executed a promissory note payable to Holder for $100,000. The note provided in part that Bokor would make "quarterly payments of interest on the first day of each September, December, March and June." It also provided that any cash that was to be distributed to Bokor from the sale of lots in Harbor Gate would be applied to principal and that "in any event, this loan shall be

due and payable no later than May 1, 1984, and demand for payment may be made at that time." The note further provided:

In the event [Boker] defaults in making any payments hereunder, [Holder], at [his] option may demand the immediate payment of all accrued interest and outstanding principal. At Holder's option in the event of default, Bokor may be deemed to forfeit his interest in Harbor Gate subdivision in satisfaction of the indebtedness evidenced hereby and he hereby agrees to execute any document convenient to evidence the transfer of all interest in the property to the holder of this note.

The evidence is that Bokor is a very experienced real estate developer and also has considerable experience in the residential and commercial construction businesses. Holder had little experience in these areas but was in a position to provide the financial backing for the project.

Before the property could be developed, it was necessary that a subdivision plat be approved by the Metropolitan Planning Commission. The Metropolitan Government of Nashville and Davidson County required a bond or a letter of credit to secure completion of the development work, that is, the completion of roads and sewers in the subdivision.

The Third National Bank issued its letter of credit in the amount of $464,194. To secure the letter of credit, a deed of trust to the property was given and personal limited guaranties were signed by Bokor and Holder.

Lot sales in Phase I of Harbor Gate did not actually begin to close until January 1984. Most of these sales were made to individuals with whom Bokor had entered into an agreement to construct a quadraplex on the property purchased by the individuals. Holder had no ownership in Bokor's construction activities and received no part of the payments made to Bokor under the construction contracts.

In early 1984, Bokor and Holder each received title to four lots which Bokor valued at $15,000 each for a total of $60,000.

By May 1, 1984, the maturity date of the promissory note, Bokor had made only one of the contemplated interest payments and had repaid no principal. By that same date, twenty-eight lots had been sold for a total of $392,000 and disbursements of $101,000 had been made for the costs of developing Phase I of Harbor Gate.

Phase II of Harbor Gate began in February, 1984. On May 4, 1984, Third National issued letters of credit in the amount of $872,000 for the development of Harbor Gate Phase II. Bokor and Holder each signed limited guaranties at Third National for one-half of the $872,000. An additional $100,000 credit was issued to defendant HOBOCO by Third National. HOBOCO was formed to hold legal title to the property. As of May 1, 1984, Bokor had not advanced any money to be used for development costs. As of May 1, Bokor's cash investment consisted of the $40,000 he had advanced to purchase the property. At that time he had received lots worth $60,-000 and profits from the construction of the quadraplexes.

Sales of the lots in Phase I for which Bokor stated he had commitments prior to the signing of the agreement between Bokor and Holder never fully materialized. Lot sales proceeded slowly and were far behind Bokor's expectations. Of the twenty-eight lots which had been sold, twenty-two were of the original fifty-six commitments and an additional six lots had been sold to a Mr. Noureddina. The development cost as of May 1 had far exceeded the cash flow from the sale of lots.

Bokor, on or around May 1, 1984, the date the promissory note was due, told Holder that he had commitments for the sale of approximately sixty additional lots. These lots were in Phase II. Before any of these lots could be sold, the plat for Phase II had to be recorded with the Metropolitan Government of Nashville and Davidson County. A bond or a letter of credit in the amount of $872,000 was required before the Phase II plat could be recorded. As we have stated, the necessary letters of credit

were issued by Third National Bank on May 4.

Only sixteen lots were sold in Phase II, and Bokor did not make any payments due under the promissory note. On July 27, Holder sent Bokor a certified letter informing him that he was exercising his option under both the agreement and the promissory note to take complete ownership of the property. Holder assumed complete ownership of the property and Bokor remained on the premises as a contractor for some ninety-two apartment units under construction.

After assuming ownership of Harbor Gate, Holder assumed complete financial responsibility for debts incurred in the development of Harbor Gate. He also attempted to sell lots. Occasionally Holder did ask Bokor to assist him in resolving problems associated with Harbor Gate, although he testified that Bokor's efforts were of very limited success.

It was necessary after his assumption for Holder to pay out of his own pocket additional funds above and beyond those received from the sale of lots in order to keep Harbor Gate afloat. As of the date of trial, Holder had paid an additional $225,000 above moneys received from lot sales. Bokor has never paid any part of the money advanced by Holder.

Bokor has presented three issues for our consideration. The first is "[w]ere the forfeiture clauses of the parties' agreement and promissory note valid, or were they unconscionable as a matter of law."

■ Bokor contends that the forfeiture provisions of the agreement and promissory note should be deleted on the ground that equity abhors a forfeiture. As a general rule, forfeitures are not favored by the law. *Burchfield v. Hodges*, 29 Tenn.App. 488, 197 S.W.2d 815 (1946). In this case, two knowledgeable business men entered into an agreement that they would purchase 68.9 acres of land for $280,000, that each would pay one-half of the purchase price, and that they would share all expenses associated with development of the land. When Bokor could not come up with one-half of the purchase price, Holder lent him $100,000. The agreement and the promissory note provided that under certain conditions Bokor would forfeit his right to the property. Bokor entered into this agreement and executed the promissory note of his own free will. There is no evidence of any overreaching or fraud in this case. The agreement and promissory note are clear and unambiguous. Where a contract is clear and unambiguous, the parties' intentions are to be determined from the four corners of the contract. *Pierce v. Flynn*, 656 S.W.2d 42 (Tenn.App.1983).

■ Bokor has been adequately compensated for his investment in the property. He paid a total of $40,000. He has received four lots which he valued at $60,000 and has profited from constructing apartment units for individual buyers of lots in the subdivision. In exchange for his ownership interest in the land, he has been excused from paying the $100,000 promissory note and his share of the almost $300,000 excess development costs. This issue is without merit.

Bokor's second issue is: "Did defendant-appellee, George W. Holder, Jr., waive his right to forfeiture, or was he estopped from asserting that right?"

It is Bokor's contention that, since an interest payment was due on the promissory note on the first of September 1983 and was not paid, he was in default from September 1. Bokor points out that he did not make an interest payment that was due on December 1, 1983, and that the only interest payment he made was in February 1984. He further argues that the note was due on May 1, 1984, and that "in spite" of default, Holder waited until July 1984 before exercising "his option to deem [Bokor's] interest forfeited."

Bokor further contends that Holder is estopped from exercising his rights under the agreement and promissory note by allowing Bokor to participate as a guarantor in securing the letter of credit from Third National so that the plat for Phase II could be recorded.

Under certain circumstances, even though a contract calls for performance at a specified time, the time for performance may be waived by the parties. *Welch v. W.W. Dillon & Company,* 7 Tenn.App. 430 (1928). In order to constitute a waiver of a condition of a contract, there must be consideration or an element of estoppel. *Moore v. Nashville Union Stock Yards,* 169 Tenn. 638, 644, 90 S.W.2d 524, 526 (1936). In order for there to be an equitable estoppel, the party seeking to invoke the equitable estoppel must have acted to his detriment in reliance upon the statements or conduct of the party against whom it is to be enforced. *Lawrence County v. White,* 200 Tenn. 1, 288 S.W.2d 735 (1956).

Estoppel is not favored and it is the burden of the party seeking to invoke the estoppel to prove each and every element of an estoppel. *Third National Bank v. Capital Records, Inc.,* 60 Tenn.App. 189, 202, 445 S.W.2d 471, 476 (1969).

Bokor contends that he acted to his detriment in signing the personal guaranty so that Third National Bank would issue the letter of credit enabling Phase II of Harbor Gate to go forward. Bokor contends that he acted in reliance upon the conduct of Holder, *i.e.,* Holder had not sought to enforce the forfeiture clause of the agreement and promissory note even though Bokor was in default.

A review of this record belies this contention. The decision to go ahead with Phase II of Harbor Gate was based, at least in part, upon Bokor's assurance that he had contracts for the sale of some sixty lots in Phase II. The proceeds from these sales would clear the promissory note as well as any arrearage under the agreement. The development of Phase II was not to Bokor's detriment but was in his best interest. However, the sales which Bokor supposedly arranged never fully materialized. Only sixteen of the sixty lots were actually sold and there is evidence that fourteen of these sixteen were sold due to the efforts of Holder. Bokor anticipated profits as the result of the sale of lots in Phase II. Bo-

kor also reaped profits as a contractor for most, if not all, of the apartments constructed in the Harbor Gate subdivision. Bokor knew that lots in Phase II could not be sold until the plat was recorded with the Metropolitan Government and that apartments could not be constructed on the lots until they were sold. It was to Bokor's advantage that the letter of credit issue so that the plat could be recorded and the lots made available for sale.

Bokor admits that Holder mentioned the past-due note shortly after the May 1 maturity date. In response, Bokor told Holder that the sale of the sixty lots was eminent and that the promissory note and Holder's portion of development costs would be paid. Holder relied upon these statements in not calling the note immediately upon its maturity. When it became apparent that the lots would not be sold, Holder exercised his option.

Bokor has failed to show a waiver on the part of Holder or that he (Bokor) acted to his detriment in reliance upon the statements or conduct of Holder. This issue is without merit.

By his last issue, Bokor contends that the Chancellor erred in finding that he was not "entitled to Quantum Meruit Relief."

The Chancellor, in his oral findings of fact, stated he knew of "no basis without just making some speculation as to what kind of quantum meruit award could be made or should be made."

Bokor concedes that "little proof was presented as to the value of his services." He then asked that the case be "remanded for determination" as to the amount he would be entitled to recover under "quantum meruit."

In his complaint, Bokor prayed in the alternative for "a monetary judgment for his services rendered to date on the basis of quantum meruit." The burden was upon Bokor to prove in the trial court his entitlement to a judgment for services rendered on the basis of quantum meruit. By his own admission, he failed to do so in

the trial court. "Without proof of damages, there can be no award of damages." *Inman v. Union Planters National Bank,* 634 S.W.2d 270, 272 (Tenn.App.1982).

There is no proof in this record as to the value of Bokor's services. Bokor has had his day in court with the opportunity to prove the value of his services. Through no fault except his own, he failed to do so. He is not entitled to a second day to remedy his failure. This issue is without merit.

The judgment of the Chancellor is affirmed with costs assessed against Bokor and the cause remanded to the trial Court for the collection of costs and any further necessary proceedings.

TODD, P.J. (M.S.), and KOCH, J., concur.