IN THE COURT OF APPEALS OF TENNESSEE

AT KNOXVILLE

**FILED**

December 29, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

E1998-00535-COA-R3-CV

JERRY DUNCAN FORD, INC.,            ) C/A NO. 03A01-9808-CH-00266
                                    )
        Plaintiff-Appellee,         )
v.                                  )
                                    )
                                    )
J. ROY FROST d/b/a FROST            )
CONSTRUCTION COMPANY,               )
                                    )
        Defendant-Appellant.        )
                                    )
                                    )
J. ROY FROST d/b/a FROST            )
CONSTRUCTION COMPANY,               )
                                    )
        Plaintiff-Appellant,        )
                                    )
v.                                  )
                                    ) APPEAL AS OF RIGHT FROM THE
JERRY DUNCAN FORD, INC.,            ) ROANE COUNTY CHANCERY COURT
                                    )
        Defendant-Appellee.         )
                                    )
                                    )
CUSTOMER SERVICE ELECTRIC           )
SUPPLY, INC.,                       )
                                    )
        Plaintiff-Appellant,        )
                                    )
v.                                  )
                                    )
JERRY DUNCAN FORD, INC.,            )
J. ROY FROST d/b/a FROST            )
CONSTRUCTION CO., M. JERRY          )
DUNCAN and wife, JUDY C.            )
DUNCAN,                             )
                                    ) HONORABLE FRANK V. WILLIAMS, III
        Defendants-Appellees.)        CHANCELLOR


For Appellant Frost              For Appellees Jerry Duncan Ford,
                                 Inc., M. Jerry Duncan and Judy
WILSON S. RITCHIE                C. Duncan
WALTER B. JOHNSON, II
Ritchie & Johnson, PLC           J. POLK COOLEY
Knoxville, Tennessee             JENNIFER E. RABY
                                 Cooley, Cooley & Agee
For Appellant Customer Service   Rockwood, Tennessee
Electric Supply, Inc.

WILLIAM A. NEWCOMB
Harriman, Tennessee

1

# O P I N I O N

AFFIRMED AND REMANDED                                          Susano, J.

This case is a consolidation of three breach of contract actions, each of which arose out of disputes regarding major renovations and additions to a commercial building in Harriman housing an automobile dealership owned by Jerry Duncan Ford, Inc. ("Jerry Duncan Ford"). Jerry Duncan Ford filed an action against the general contractor in charge of the project, J. Roy Frost, doing business as Frost Construction Company ("Frost"), after terminating Frost's services because of unsatisfactory performance. Frost in turn filed an action against Jerry Duncan Ford for breach of contract. The third action was filed by Customer Service Electric Supply, Inc. ("Customer Service"), against Jerry Duncan Ford, Frost, M. Jerry Duncan ("Mr. Duncan"), and Judy C. Duncan ("Judy Duncan"), seeking payment for certain exterior light fixtures that it had installed at the dealership. After a bench trial, the court awarded Jerry Duncan Ford damages reflecting the difference between the total cost of the construction and $313,200, a "ceiling" that -- as found by the trial court -- Frost had guaranteed. The trial court also awarded Customer Service damages against Frost, but denied the former's request for a judgment against Jerry Duncan Ford and the Duncans. Frost appeals, raising the following issues for our consideration:

> 1. Did the trial court err in admitting parol evidence to vary the terms of the written contract?
>
> 2. Does the evidence preponderate against the finding of an oral agreement of a guaranteed maximum price?

> 3. Is Frost, rather than Jerry Duncan Ford,
> entitled to breach of contract damages due to
> the dealership's failure to give Frost notice
> and an opportunity to cure any defects in
> construction?

Customer Service appeals the trial court's dismissal of its complaint against Jerry Duncan Ford and the Duncans.

## I.

In December, 1995, the Duncans, as owners and corporate officers of Jerry Duncan Ford, discussed with Frost the possibility of doing major renovations and additions to the dealership's building. Upon Frost's recommendation, Mr. Duncan contacted Randy Denton ("Denton"), an engineer, who, after meeting with Mr. Duncan and Frost, drafted a floorplan detailing the plans for the anticipated work.

In early January, 1996, Frost gave Mr. Duncan a one-page estimate showing the projected cost of the construction to be $100,136.[1] Mr. Duncan reviewed this estimate but noted that it did not reflect everything that he wanted done. Mr. Duncan told Frost that he wanted a list of everything that was to be done and what each item would cost. On January 20, 1996, Frost met with the Duncans at their home and gave them a revised estimate. The four-page document shows detailed costs for the construction, including the cost of (1) building a new service building and new office area; (2) remodeling of the showroom and

---

[1] Frost denies that he showed Mr. Duncan this one-page estimate, but Duncan testified to the contrary.

3

the existing office area; (3) remodeling of the exterior; and (4) miscellaneous items, such as pouring concrete slabs, renovating restrooms, patching the asphalt of the parking lot, and replacing the exterior lights. For each renovation phase described, Frost included a subtotal reflecting the addition of ten percent of the estimated cost for profit and overhead and 2.5% of the estimated cost for workers' compensation and liability insurance. Every page is signed by Frost and dated January 20, 1996. The last page contains the line: "total projected cost for complete project: $313,200." The trial court found that, at the January 20, 1996, meeting, Frost orally guaranteed that the cost of the project would not exceed $313,200.

Frost and his crew began work at the dealership the following week and continued for several months. About once a month, Frost submitted groups of invoices to Mr. Duncan for payment. These invoices included the cost of materials and labor plus the agreed-upon ten percent for overhead and profit and 2.5% for workers' compensation and liability insurance. The record reflects that Jerry Duncan Ford made four payments to Frost totaling $134,706.93. In addition, the dealership paid $92,857.09 directly to several subcontractors and suppliers.

By February, 1996, the Duncans began to notice problems with Frost's work. First, there were deviations from the original plans. The parties had initially agreed that additional concrete would be poured on the existing concrete floors in several areas of the building before tile or carpet was laid. Frost, however, installed wood strips and plywood instead of

4

concrete in these areas.  As a result, these floors squeaked, moved, and in some places, swelled.  The plans also called for the two existing restrooms to be renovated and made wheelchair-accessible in accordance with the Americans with Disabilities Act ("ADA").  However, the restrooms were not renovated in accordance with the ADA.  Consequently, a unisex restroom, which is ADA compliant, had to be built between the two existing restrooms.

The Duncans also experienced problems when changes were made to the original plans.  In the shop area, the original plans called for a two-foot drain in the center of the room.  Within the drain, PVC pipe was to be installed for an exhaust system to hook up to cars being serviced.  Mr. Duncan decided instead to install the exhaust system within the concrete that would be poured for the floor.  The exhaust ports were to be installed 30 feet from the wall on each side of the shop area.  Mr. Duncan discussed the change in plans with Frost before the concrete was poured.  However, after the exhaust system was installed, Mr. Duncan noticed that on one side of the building, the exhaust ports were only 15 feet from the wall.  Mr. Duncan testified that the misplacement of the exhaust ports made access to the ports difficult and time-consuming.

Other problems developed as well.  A wall in a hallway was bowed, causing the tile on the floor to be laid out of square.  Shelving installed in the storage area collapsed due to inadequate bracing.  Doors were installed to cover an existing communications system, but were installed in a way that blocked access to part of the system.  Doors and windows in the parts

5

area were improperly framed.  The existing roof, which had been re-roofed just months prior to Frost's work, was damaged when a support beam was removed from underneath the air conditioner on the roof, causing the roof to sag and water to collect around the air conditioner.  The roof of the new service building leaked due to excessive screws being placed in the metal.  Leaks also developed in the hallway where the roof of the new service building connected with the existing roof.  Cracks appeared in the concrete poured in the service area.  The drain in the newly constructed wash bay did not have a proper slope.  The wrong type of carpet was installed in the general storage area and in a hallway.  The drain installed in the center of the shop area would not drain properly, and the grate installed over the drain had to be replaced because it was not strong enough to withstand the weight of an automobile driving over it.

As these defects became evident, Mr. Duncan noticed that Frost was rarely, if ever, on the job site.  Frost admitted that during the months of March and April, he was spending only 30 minutes to an hour at the dealership, and that he usually would come by at 6:00 or 6:30 in the morning -- well before the Duncans got to the dealership -- to discuss the project with his crew.  In late April, Mr. Duncan went to another of Frost's job sites at the Rocky Top Market in Harriman and confronted Frost. Mr. Duncan told Frost that Frost had to spend more time at the site or he would pull Frost's men off the job.  The following week, Frost spent over 50 hours at the dealership.  During the next four weeks, however, he spent no more than six hours per week at the site.  During the first week of June, Mr. Duncan made

6

several unsuccessful attempts to contact Frost. On the morning of June 5, 1996, Frost contacted the dealership several times to say that he would be there shortly. When he did not arrive by that afternoon, Duncan "fired" Frost's crew.

At the time of Frost's termination, the work was only 50 to 60 percent complete, and Jerry Duncan Ford had already expended $227,564.05 on the renovations and additions. On June 15, 1996, ten days after his termination, Frost submitted a group of invoices, totaling $76,237.81, to Jerry Duncan Ford for payment, but Mr. Duncan refused to pay them. Among these unpaid bills was an invoice from Customer Service for the lights that were installed on the exterior of the dealership in May, 1996.

On July 24, 1996, Jerry Duncan Ford filed a complaint against Frost for breach of contract. On the same day, Frost filed a complaint against Jerry Duncan Ford, also alleging a breach of contract. On April 21, 1997, Customer Service filed a complaint against Jerry Duncan Ford, Frost, Mr. Duncan, and Judy Duncan, seeking payment for the exterior light fixtures. All three actions were subsequently consolidated for trial, a trial which extended over seven days of testimony.

At the conclusion of the proof, the trial court made findings, including the following:

> Mr. Frost admits that Mr. Duncan was upset about the progress and the quality of the work being performed in the dealership. He says that Mr. Duncan came to where he was working on the Rocky Top Market.

7

He claims that Mr. Duncan had his fist clenched and told him to spend more time on the job or just get his men off the job. Others apparently sent requests for Frost to come to the job, but he apparently, other than his early morning visits, did not do so.

Mr. Frost does admit -- does not admit, but the Court finds, that the work was not progressing properly. The work was progressing slowly, and some defective workmanship was showing up. Had Mr. Frost been on the job more of the time, some of this could have been avoided.

Time sheets clearly show that Mr. Frost, after the first few months, spent very little time at the dealership. He may have come by early in the morning to give instructions for the day, but Mr. Frost could have avoided much of these problems by giving his personal attention to the actual performance of the work, and the Court feels that this is not, per se, a breach of the contract but is related to the plaintiff's complaint that the work was being improperly supervised, was not making reasonable progress, and that some defects in the workmanship were resulting.

The trial court held that Jerry Duncan Ford was entitled to recover $215,826.10, the difference between the guaranteed maximum price of $313,200 and the total cost expended by the dealership on the renovations and additions.[2] The court then reduced this amount by $25,000, to reflect work that the court determined was not reasonably necessary to remedy the existing problems and for work done in excess of the original contract. The trial court also awarded breach of contract damages to Customer Service against Frost in the amount of $24,856.53, plus attorney's fees of $8,285.51. Because Customer Service had failed to prove the reasonable value of the light

---

[2]Duncan hired another crew to fix the defects in the work performed by Frost Construction and to complete the renovations of the building. The total cost to complete the renovations was $529,026.10.

fixtures in order to establish a claim for *quantum meruit*, the trial court dismissed its action against Jerry Duncan Ford and the Duncans.

## II.

In this non-jury case, our review is *de novo* upon the record, with a presumption of correctness as to the trial court's factual determinations, unless the preponderance of the evidence is otherwise. Rule 13(d), T.R.A.P.; *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993). The trial court's conclusions of law, however, are accorded no such presumption. *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26, 35 (Tenn. 1996).

We also note that the trial court is in the best position to assess the credibility of the witnesses; therefore, such determinations are entitled to great weight on appeal. *Massengale v. Massengale,* 915 S.W.2d 818, 819 (Tenn.Ct.App. 1995); *Bowman v. Bowman,* 836 S.W.2d 563, 566 (Tenn.Ct.App. 1991). In fact, this court has noted that

> on an issue which hinges on witness credibility, [the trial court] will not be reversed unless, other than the oral testimony of the witnesses, there is found in the record clear, concrete and convincing evidence to the contrary.

*Tennessee Valley Kaolin Corp. v. Perry,* 526 S.W.2d 488, 490 (Tenn.Ct.App. 1974).

## III.

The first issue raised by Frost is that the trial court erred in admitting parol evidence to vary the terms of the

10

written contract between Frost and Jerry Duncan Ford.  The trial court, in its oral remarks after closing argument, made a specific finding that the contract between the parties consisted of the floorplan and the four-page estimate ("estimate" or "Exhibit 8") drafted by Frost.  Later in its remarks, the trial court referred only to the estimate as the written contract.  The trial court stated that

> [o]n the face of the writing, there is nothing ambiguous about it.  It is clear and unambiguous.  The figures set out were plainly estimates or projected costs.  The written contract purports to contain all of the terms upon which the work was to be performed by the defendant Frost.
>
> *     *     *
>
> However, in this case both parties, all parties have offered without objection, and I want to repeat that because I think it's important, without objection, extensive parole [sic] evidence bearing directly upon the terms of the contract, some of which have the effect of adding additional and conflicting terms to the contract, Exhibit No. 8.
>
> In other words, this case was tried as if the parole [sic] evidence rule was not applicable with oral testimony being elicited from all parties about conversations and consequently agreements which tend to vary the plain and unambiguous language of Exhibit No. 8.
>
> The evidence then as submitted to the Court raises no issue about the application of the parole [sic] evidence rule and simply leaves it to the Court to weigh the evidence, including the oral testimony, for the purpose of determining the agreement of the parties.

The trial court proceeded to examine the testimony concerning the agreement between the parties and in so doing determined that

11

Frost had guaranteed that the cost of the project would not exceed $313,200.

In order to determine whether the testimony regarding Frost's alleged guarantee was properly admitted, we must first determine whether the parol evidence rule applies to the facts of this case.

The parole evidence rule provides that extraneous evidence is not admissible to alter, vary or qualify the terms of an unambiguous *written contract*. *GRW Enterprises, Inc. v. Davis,* 797 S.W.2d 606, 610 (Tenn.Ct.App. 1990). Thus, the rule does not exclude parol evidence where the agreement between the parties is itself an *oral contract*.

We find that the four-page estimate is just that, an *estimate*. Significantly, each page is signed by Frost, *but none of the four pages are signed by or on behalf of Jerry Duncan Ford, or the Duncans or any of the three of them*. While the four-page estimate is clearly an offer by Frost to undertake the subject project, there is nothing in the document to indicate an acceptance by anyone. Therefore, we find that the four-page estimate is only a *part* of the contract between the parties. A contract that is partly in writing and partly oral is treated as an oral contract. *Myers v. Taylor,* 64 S.W. 719, 720 (Tenn. 1901). In such a case, both the writing and the parol testimony are competent evidence of the entire agreement of the parties. *Id.* It is evident from the parol testimony presented at trial that essential terms of the parties' agreement -- such as Jerry

12

Duncan Ford's acceptance; the date of commencement of work; the method of paying for and selecting materials; the anticipated date of substantial completion; the method for making change orders and the like -- were not reduced to writing. The estimate merely lists the areas of the dealership to be renovated, the new areas to be constructed, and the projected cost for each phase of the work. If in fact the estimate constituted the "written contract" between the parties, the contract would fail for a lack of definiteness because it does not sufficiently define the essential terms of the parties' understandings. *See Peoples Bank of Elk Valley v. ConAgra Poultry Co.,* 832 S.W.2d 550, 553 (Tenn.Ct.App. 1991). The testimony presented to the trial court was properly admitted, not because the parties waived application of the parol evidence rule,[3] but because the testimony concerned the formation of the parties' oral contract and the terms thereof.

Having determined that the testimony regarding the parties' agreement was properly considered by the trial court, we now address Frost's argument that the evidence preponderates against the trial court's finding of a guaranteed price. Frost contends that the evidence preponderates against a finding of a guaranteed price because (1) his version of the conversation is corroborated by the "written contract"; and (2) the parties' conduct was not consistent with a contract for a guaranteed maximum price.

---

[3]As to whether an objection to inadmissible parol evidence is necessary to raise the parol evidence rule, see *Tri-Cities Forlift Co. v. Conasauga River Lumber Co.*, 700 S.W.2d 548, 549 (Tenn.Ct.App. 1985).

The trial court was presented with the testimony of Mr. Duncan, Judy Duncan, and Frost regarding their discussions on January 20, 1996, the date on which the parties' basic agreement was struck. The parties each testified to their version of the conversation that ensued when Frost presented the Duncans with the estimate for $313,200. Mr. Duncan testified as follows:

> I asked Roy, I said, Roy, can you build this building the way we want it here for this amount of money? He said, yes, I can.
>
> I said, we didn't anticipate spending this much money. And I told him, I said, but things always run a little more than what you anticipate. And he said yes. And I said I wanted to spend $300,000 on doing the building.
>
> He said, Jerry, he said, I don't think I can do that for 300,000, but I'll tell you what I will do. He said, I'll try to get you out for 300,000, but I will guarantee you that it will not exceed 313,200.
>
> And I said at that point, I said to him, now, Roy, I said, how are you going to do the buying and so on and so forth? He said, you all can buy anywhere you want to as long as we agree on it. He said, I'll give Judy budgeted amounts to spend in certain areas. And I said, well, I understand that.
>
> And he said again that he would build a building that we would be proud of. And I said, are you sure you can build this building for three-thirteen-two? Oh, yes, he said, I try to figure my jobs a little high; I'd rather come in a little high as to come in low and then have to go up on the person.
>
> And at that time I said to him, I said, well, Roy, sign this right here. And we were sitting at the bar at the house.

Judy Duncan then testified as follows:

> Q: Okay. Going back to the discussions that you and Mr. Duncan had with Mr. Frost on

14

January the 20th, was there any discussion as to the contract price, the entire contract price?

A:   Yes, very much so, because Jerry and I had talked privately about what we felt like we could do.  And when Mr. Frost came back with the price that was somewhat over 311 or 312,000 or 300 or 311,000 or whatever, Jerry kept reiterating -- and I said to him -- I said to Mr. Frost the same thing, that we really wanted to stretch that out for the 300,000.  And Mr. Frost replied to me that "When I am doing a project contract, writing out a project and figuring a project contract, I always figure those high because I always like to come in low on my contracts. That has just always been my technique."  So he said, "I feel like that we have room here that we can very well come in within the 300,000 or below that."  So, then, I talked to him about lighting.  And --

Q:   Wait.  Was there in that price, that $313,200, was there any discussion about the supervision of the job and, if so, can you describe the substance of those conversations?

                *    *    *

A:   What Mr. Frost said to us over and over and reiterated to us is that he took great pride in his work, that he was in a position that he could be on our job continually because he did not have another job at that time, and that he would see to it that everything was done as he knew we wanted it to be done, that we were -- he knew we were particular and we had certain things in mind, he wanted to adhere to those, and he also wanted to see that the best work was done. So he promised us at that time and upon signing that contract, that he would be on the job daily overseeing.

Q:   Was there any agreement as to the completion date of the contract?

A:   Yes.  Mr. Frost told us that he would be finished by June 1st.  And jerry [sic] said, "Now, this is going to effect [sic] our business because, you know, when you tear up, it's hard to do business around that and it's costing you money on a daily basis."  And so Jerry was emphatic about that because of possibility of losing business.  So, because

15

of that, Roy said, "I can guarantee you that I can complete all of this work by June 1st."

Later, Judy Duncan was again questioned about the contract price:

Q:   And can you tell the Court again the total contract, because I think that was confusing you a few minutes ago.  What was the contract amount?

A:   $313,000 and -- 213,200.

Q:   In thinking back, Ms. Duncan, to that afternoon when you were going over those figures and discussing that contract price, were the words "guaranteed" ever mentioned to you that day in regard to that contract and that price?

A:   Yes.  More than once Mr. Frost said that he would guarantee us that it would not exceed this 313,200, but that he would do his best, his very best, and felt very confident that he would be able to stay within the $300,000 range.

Q:   Is that contract signed?

A:   Yes, each page, because Jerry and I asked that he sign each page of the contract --

Q:   Is Roy Frost's signature --

A:   --- and date it.  Yes.  And he dated -- and he dated the page also.

Roy Frost testified as follows:

A:   Jerry said, well, I'd like to get by for 300,000 if I could, and I told him --

Q:   Do you know where he derived the figure of 300,000 in that discussion?

A:   That is the first I ever heard of 300,000.  I never heard of it, but he said, I would like to -- I would like to get by with $300,000 if I could.  I said, well, the only thing that I can tell you is that we'll go to

16

work like we agreed upon because we talked about a cost-plus fee basis. He would pay my labor bills from timecards, and they could be furnished if they were needed.

*    *    *

[Jerry Duncan] could control the cost. They could help control the cost, and we'll spend whatever money that they wanted to spend, and when we got to the $300,000, we would either quit -- quit at any time they wanted to quit.

Q:   Was there ever a discussion by you and Mr. Duncan or his wife when you took this construction cost estimate up there to their home that you would do this work for the specified sum of three hundred thirteen thousand 200 some odd dollars?

A:   I never heard of that figure until it come up to lawsuit time. I never heard that.

Q:   As a specified sum?

A:   As a specified sum, never had any idea.

Q:   Did you at that meeting ever guarantee either one of them that you would do this renovated project for the specified sum of three hundred thirteen thousand and 200 some odd dollars?

A:   No. I did not. The only thing that was agreed upon at this time when we started that job I was asked the question about when I could start, and I told him we'd start it immediately. Jerry and I discussed about his dealership having to be open and first one thing and another and the difficulty it would be and things like that.

I told him that we could start immediately on the project and that we would work around all that we could and that once we started that project that Frost Construction Company, not Roy Frost, would never leave that job. I said Frost Construction Company will not quit on this job. We will not stop this job until we are completed.

After hearing this conflicting testimony, the trial court resolved the factual issue of the alleged guarantee in favor of the Duncans, finding that Frost's testimony was not credible:

17

> I had no way of resolving any of this dispute about the guaranteed maximum, because I had the Duncans saying one thing, at least in part, and I had Mr. Frost swearing to the exact opposite. But Mr. Frost, on the 4th day, endured what can only be described as a rigorous if not a grueling cross-examination in which he did very badly, I will have to say for Mr. Frost.
>
> The testimony appeared quite often to be very deceptive, to be not credible on many fronts...
>
>         \*     \*     \*
>
> [A]t the conclusion of his cross-examination, I had lost confidence in what he was telling me.
>
> He denied that Mr. Duncan ever told him that he, Mr. Duncan, wanted to know what the building was going to cost him. Well, I just don't believe that. I believe Mr. Duncan did want to know what the building was going to cost him. I think that he asked him, and I think Mr. Frost made some statements in that regard.

Frost argues that the trial court's determination of his credibility was in error because his version of the events of January 20, 1996, is, according to Frost, corroborated by the estimate, which does not mention a guaranteed price. While it can be argued that the failure of the four-page estimate to mention the concept of a guarantee is consistent with Frost's testimony, the trial court nonetheless found his testimony "to be very deceptive" and not worthy of belief. The determination of a witness' credibility is for the trial court and such determinations "will not be disturbed on appeal unless real evidence compels a contrary conclusion." *McReynolds v. Cherokee Ins. Co.,* 815 S.W.2d 208, 210 (Tenn.Ct.App. 1991). The four-page estimate's silence on the question of a guarantee is not enough "to compel[] a contrary conclusion." *Id*. Thus, we will not

18

disturb the trial court's finding that Frost guaranteed that the cost of the renovations and additions would not exceed $313,200.

Frost contends that the parties did not act in a manner consistent with a contract for a fixed price because (1) Frost was paid on a cost-plus basis; and (2) because Jerry Duncan Ford, allegedly without Frost's knowledge, paid $92,857.09 directly to suppliers and subcontractors. Frost argues that if the contract had been for a fixed price, he would have exercised stricter control over such expenditures.

We find that the parties' actions were not inconsistent with a guaranteed maximum price. There is no dispute that the parties agreed that the work would be performed on a cost-plus basis; however, the parties also agreed -- as found by the trial court -- that the total cost, including the "plus" additions, would not exceed $313,200. Thus, although the work was paid for on a cost-plus basis, the evidence preponderates that the parties were operating under a guaranteed maximum budget. Denton testified that he heard Frost say that the project was within budget. Both Mr. Duncan and Judy Duncan testified that before selecting any supplies, they would ask Frost whether they were within the budget, and that Frost always replied in the affirmative. Steve Kirkham, the owner of the Rocky Top Market where Frost was also working at the time, testified that he heard Frost mention that he was below budget on the Jerry Duncan Ford project. We find that the existence of this budget is not inconsistent with a guaranteed maximum price.

19

Moreover, the fact that Jerry Duncan Ford bought supplies or paid some suppliers directly for their services does not contradict a finding of a guaranteed price. First, the evidence preponderates that the parties had agreed that Jerry Duncan Ford could purchase materials directly so long as Frost approved of such purchases. Both Duncans testified that they sought and obtained Frost's approval before making any purchases. As for the direct payment of suppliers, Jerry Duncan testified that he had to pay some suppliers because they were due payment when the supplies arrived on the site, and Frost was not there to pay for them. Thus, we find Frost's argument on this point to be without merit.

IV.

Frost next argues that because Jerry Duncan Ford made the first material breach of contract by failing to give Frost notice of the defects in the construction and an opportunity to cure, the trial court erred in awarding damages to Jerry Duncan Ford. Frost claims that he is entitled to damages arising from Jerry Duncan Ford's breach.

Generally speaking, notice and an opportunity to cure must be given before a party may terminate a contract for faulty performance. *McClain v. Kimbrough Constr. Co.,* 806 S.W.2d 194, 198 (Tenn.Ct.App. 1990). Failure to give such notice constitutes a material breach of the contract and entitles the party, who was denied the opportunity to cure, to an award of damages. *Id.* at 199.

20

Frost and several members of his crew, including the supervisor of the project, Michael Frost, testified that, with few exceptions, they did not receive any complaints about the quality of the work. The defendant Frost testified that a complaint was made about a door being out of square, but it was immediately corrected. He also stated that "some statement was made" concerning the wrong kind of carpet being installed in the storage area, but that it was not a "big deal." Frost testified that "bubbles", which appeared in some of the areas covered by the wood strips and plywood, were also corrected.

The Duncans testified, on the other hand, that they made several complaints throughout the course of the construction. The Duncans complained to Frost about cracks in the concrete in the service area. They complained to Michael Frost about the drain backing up in the shop area. Mr. Duncan called Frost's attention to water collecting on the roof around the air conditioner. An employee of Jerry Duncan Ford testified that he pointed out to Michael Frost that the exhaust ports were being installed too close to the wall. The Duncans complained about the interior painting in several areas of the dealership. Also, the metal roof began leaking while Frost's crew was still on the job, and thus would have been an obvious defect that needed correction.

The record further shows that Frost received notice approximately one month prior to his termination that the Duncans were very dissatisfied with his performance. In late April, 1996, Mr. Duncan confronted Frost at the Rocky Top Market. Mr.

21

Duncan told Frost that he would pull Frost's men off the job unless Frost returned to the job site. This confrontation notified Frost of Mr. Duncan's dissatisfaction with the progression of the work and Mr. Duncan's belief that Frost's lack of attendance was contributing to the defective workmanship. Although Frost returned to the job site the next week, his attendance declined thereafter. By June, 1996, Duncan was still faced with numerous defects in the construction that were unresolved; also, Frost was not appearing on the job site. It was at this point that Mr. Duncan told Frost's crew to leave the job site.

We find that the evidence does not preponderate against a finding that both notice and an opportunity to cure were provided to Frost prior to the termination of the contract. Again, the trial court was presented with conflicting testimony from the parties. Although the trial court did not specifically address the issue of notice in its opinion, the court did discuss at length the credibility of the witnesses. The trial court clearly gave little credence to Frost's testimony, which was severely discredited on cross-examination. Thus, we cannot say that the evidence preponderates against a finding that Frost and his crew were provided sufficient notice and an opportunity to cure the defects that arose during the construction.

V.

Customer Service appeals the dismissal of its claim for damages against Jerry Duncan Ford and the Duncans, arguing that

22

an express contract for the exterior light fixtures existed between the parties.  In the alternative, Customer Service argues that it should recover *quantum meruit* because an implied contract existed between the parties.  In support of both arguments, Customer Service contends that Mr. Duncan, acting on behalf of Jerry Duncan Ford, ordered the light fixtures for which Customer Service was not paid.

We find that the trial court correctly dismissed Customer Service's claim.  The evidence overwhelmingly indicates that an express contract for the exterior lights existed between *Frost* and Customer Service.  Mike Edwards, co-owner and vice-president of Customer Service, testified that Frost initially ordered the exterior light fixtures.  The next day, Frost called and cancelled the order.  One week later, a meeting occurred between Edwards, Frost, Mr. Duncan, and the electrical subcontractor for the purpose of selecting exterior light fixtures.  Although at that meeting Duncan selected the type of fixtures to be installed, it was Frost who later called Edwards and placed the order.  Moreover, the manner in which Customer Service had been paid prior to the submission of the June 15, 1996, invoice also reflects an express contract between Frost and Customer Service.  Helen Neal, an employee of Jerry Duncan Ford, testified that the Customer Service invoices were billed to Frost.  Frost would then turn in the invoices, including a charge for the "plus" additions, to Jerry Duncan Ford.  A check would then be issued payable to *Frost* to cover the amount of the invoice as well as the percentages added for the "plus" items.

23

Thus, the parties' conduct demonstrates that an express contract existed between Frost and Customer Service.

Customer Service's argument that it should recover against Jerry Duncan Ford or the Duncans on an implied contract theory is also without merit. An implied contract or *quantum meruit* action is an equitable remedy that allows a party who has provided goods and services to recover the reasonable value of those goods and services if the following five factors are met:

> (1) there must be no existing, enforceable contract between the parties covering the same subject matter;
>
> (2) the party seeking recovery must prove that it provided valuable goods and services;
>
> (3) the party to be charged must have received the goods and services;
>
> (4) the circumstances must indicate that the parties involved in the transaction should have reasonably understood that the person providing the goods or services expected to be compensated; and
>
> (5) the circumstances must also demonstrate that it would be unjust for the party benefitting from the goods or services to retain them without paying for them.

*Castelli v. Lien,* 910 S.W.2d 420, 427 (Tenn.Ct.App. 1995)(citations omitted). A recovery for *quantum meruit* is limited to the actual value of the goods or services received, not the contract price. *Id.* Thus, a party seeking *quantum meruit* must prove the reasonable value of the goods or services. *Id.* at 428; *Bokor v. Holder,* 722 S.W.2d 676, 681 (Tenn.Ct.App. 1986).

24

Customer Service presented no proof concerning the reasonable value of the fixtures.  Counsel attempted to elicit testimony in regard to the *contract price* of the fixtures, but made no attempt to establish the fixtures' reasonable value. Customer Service argues that the trial court "thwarted" its attempt to prove reasonable value; however, we find no merit in this claim.  The trial court merely sustained an objection made to repetitive questions asked by Customer Service's counsel concerning the *contract price* for the fixtures.  The record shows no attempt by Customer Service to establish the reasonable value of the goods.  Thus, the trial court correctly dismissed Customer Service's implied contract claim against Jerry Duncan Ford and the Duncans.

## VI.

The judgment of the trial court is in all respects affirmed.  Costs on appeal are taxed to the appellants.  This case is remanded to the trial court for enforcement of that court's judgment and for collection of costs assessed below, all pursuant to applicable law.

_____
Charles D. Susano, Jr., J.

CONCUR:

_____
Herschel P. Franks, J.

25

_____
D. Michael Swiney, J.